## TEXAS PAC. COAL & OIL CO. v. TRUESDELL.

### No. 2502.

Court of Civil Appeals of Texas. Eastland.

April 6, 1945.

Wm. K. Hall, of Fort Worth, and Ben J. Dean, of Breckenridge, for appellant.

L. H. Welch, of Breckenridge, for appellee.

LESLIE, Chief Justice.

Arthur Truesdell instituted this suit on April 13, 1944, against the Texas Pacific Coal and Oil Company to recover damages in the sum of $1025 for permanent injuries to his land, for the death of 100 goats, for the loss of 100 kids alleged to have been prematurely born, and for taking up and removing certain pipe lines. All damages sought, except for the removal of pipe lines, was alleged to have resulted from the escape of oil, salt water and slush from appellant's operations in producing oil and gas from the land on which it held a mineral lease in usual form.

The oil company answered by general denial and certain special pleas.

The case was tried before the court and jury and resulted in a judgment that appellee Truesdell take nothing on his claim (1) for injuries to his land, (2) the taking up and removal of lines, and (3) the alleged premature birth of kids.

He recovered judgment for $500 as the value of 100 goats which the jury found died as a result of drinking oil from an alleged "leaky oil pipe line" negligently maintained by said company and extending between its wells numbers 1 and 2.

The appellant's motions for instructed verdict and for judgment non obstante veredicto were overruled.

The appellant's first point is believed to be controlling. It is as follows: "The evidence in this case, which wholly fails to show that any of appellee's goats drank oil that had leaked from appellant's pipe line, but affirmatively shows that oil and salt water from other sources were equally available for drinking by such goats, is insufficient as a matter of law to support the verdict and judgment in appellee's favor."

Said point is presented under two propositions, the first of which will now be considered and which is, in substance, that, as a matter of law, since the evidence conclusively shows that it was equally as probable that appellee's goats died as a result of drinking oil from sources other than leaks in appellant's pipe line (between wells 1 and 2) the court's finding that the goats did in fact die from drinking oil that had leaked from said pipe line is without support in the competent evidence, but, on the contrary, is based solely upon surmise, conjecture, guesswork and speculation, rendering it necessary that judgment herein be reversed and rendered in behalf of appellant.

The only ground of negligence submitted to the jury was the oil company's alleged negligence in maintaining a "leaky pipe line." The issues submitted were:

"Special Issue No. 1.

"Do you find from a preponderance of the evidence that the Defendant maintained

a leaky oil pipe line between Well No. One and Well No. Two, on the Daniel Lowe Lease in Stephens County, Texas?

"Answer 'Yes' or 'No.'

"Answer: Yes.

"Special Issue No. 2.

"Do you find from a preponderance of the evidence that the maintenance of such leaky oil pipe line if any was negligence?

"Answer 'yes' or 'no'.

"Answer: Yes.

"Special Issue No. 3.

"Do you find from a preponderance of the evidence that such negligence, if any, was the proximate cause of the damage, if any, to said goats?

"Answer 'yes' or 'no'.

"Answer: Yes.

"Special Issue No. 4.

"How many goats, if any, do you find from a preponderance of the evidence that died as a result of drinking the oil that leaked out of said leaky oil pipe line?

"Answer in numbers.

"Answer: 100.

"Special Issue No. 5.

"What amount in dollars and cents, if any, do you find from a preponderance of the evidence was the reasonable cash market value of said goats per head?

"Answer in dollars and cents.

"Answer: $5.00."

Obviously the jury's verdict supports only the alleged negligence of appellant in maintaining this particular "leaky oil pipe line" and finds that such negligence alone was the proximate cause of appellee's damages. No other ground of negligence was submitted to the jury, and appellant does not complain of such limited submission.

By said proposition the appellant insists that oil, salt water and slush ran into the pasture at the same time from numerous other sources and was equally available to appellee's goats. That this record presents no evidence from which the jury could possibly segregate and identify the damage, if any, resulting from the "leaky oil pipe line" from the damages, if any, resulting from such other sources of oil, salt water and slush available to appellee's goats.

As to these "other sources", appellant insists some of them—such as slush and oil pits at the rig—were incident to or necessary to the proper development and operation of the lease in which the company

owned the dominant estate, and that as to these and said other sources no injury to appellee was shown to result from any act of negligence upon the part of the appellant.

The above contention must be examined in the light of the factual background of appellant's lease contract. It is in the usual form and was executed by Daniel Lowe to the appellant in 1916, and after three or four changes in ownership and operation the lease found its way back (October 1, 1940) into the hands of appellant, T. P. Coal and Oil Company. The appellee herein owns all the surface of the lease by which the company holds and operates the same.

"Of course, in a lease of this character the surface estate is servient to the mineral estate for the purposes of the mineral grant, but even this right is to be reasonably exercised with due regard to the rights of the owner of the surface." Gulf Production Co. v. Continental Oil Co., 139 Tex. 183, 132 S.W.2d 553, 562, 164 S.W.2d 488, citing many authorities.

Evidently the appellant is the owner of the dominant estate, and the appellee does not question the appellant's "reasonable exercise" of its right under the lease, except as to the alleged "leaky oil pipe line." As to all other claimed damages, appellee did not request the submission of such issues and the court did not submit them, and appellee does not challenge such rulings.

In substance appellee alleges herein that he lost from said causes 100 goats of the value of $5 per head. The "leaky oil pipe line" referred to in said issues, which the jury found had leaked and proximately caused appellee's loss, was a two inch line through which oil was pumped from well No. 1 to well No. 2 and extended about one-half mile with its entire length across appellee's pasture. Wells Nos. 1 and 2 and a large portion of said pipe line were in one pasture. The appellee testified, however, that he lost goats over his entire pasture, that the gates were open and the goats could go anywhere they desired. Presumably the goats had access to oil, salt water and slush wherever deposited on appellee's land. Pipe lines ran in various directions across his land and concerning same he said, "There is one vacuum line coming out of the Rogers, and there is an 8" lines that runs across my place, and they have a 5 3/16ths inch line about half a mile from the No. 1 to the No. 2."

There is general testimony that all pipe lines leak at one time or another. Specifically referring to those running over and through his pasture, the appellee testified in part as follows:

"Q. Now, you testified yesterday, I believe about going up to this well with someone and the oil and salt water was spouting up about 18 inches. When was that with reference to point of time they brought the injunction suit? A. That was right after that.

"Q. It was right after that time? A. Yes, sir.

"Q. How long had that oil and salt water been spouting up there prior to that time? A. Oh, *about 18 months or two years.*

"Q. Where was that oil and salt water going that was spouting up there? A. It just fell down on the floor and ran on off.

"Q. *Where did it run? A. It ran down through my pasture into the ravine.*

"Q. Now, which well was it, with reference to the number of the well, where the salt water and oil were spouting up about 18 inches when it was pumping? A. Well, it was the No. 2. Of course, the No. 1 was connected with it.

*   *   *   *   *

"Q. Since they (appellant) started operating the lease, what has been the condition of the slush pit? A. Well, *the slush pit is still in good shape,* as far as the pit is concerned. They laid a line going from the well to the slush pit and the oil and salt water was going straight up and coming back down.

"Q. You mean down on the derrick floor? A. That's right.

"Q. *Then where did it go from there? A. It ran off the floor onto my pasture.*

"Q. *It ran down in your pasture rather than going into the slush pit?* A. Yes, sir.

"Q. Over what period of time prior to their filing the injunction suit against you had that condition existed? A. Well, for 18 months when they taken it over.

"Q. *State whether or not the salt water, oil and B. S. or any of it came out and ran down from the slush pit? A. That's right, it did.*

"Q. *How did it get out of the pit?* A. *Well, it rained and overflowed the dam or dike, whatever you call it.*

"Q. State whether or not these repairs were made after they had been out there and the goats were cut open and they saw the oil in them? A. Yes, the repairs was done after that, around the tanks and the well."

Appellee was asked the further question:

"Q. And isn't it a fact that you said some of your goats had drank some oil and they asked you where they got it and you said: '*Down at the pipe line*'. Isn't that a *fact?* A. *No, I said anywhere in my pasture.*"

At another point he testified:

"Q. All right, where did you see the oil running out in your pasture? A. Well, it was all along this line where the leaks were. Whenever he would pump, *in this particular leak they had in the eight and a quarter inch line,* the oil leaked out and naturally it would get full and it would run down into the creek.

"Q. Did you see it running down there? A. That's right, I did.

"Q. On different occasions? A. Yes, sir.

"Q. What are the facts with reference to that running down the main drain into this ravine, whenever it would rain, that is, with reference to oil and salt water washing down the main ravine? A. It would run down the main drain.

"Q. State what the facts are with reference to whether or not that was the pasture in which your goats ran? A. *Yes, sir. It ran right down the middle of my pasture.*

"Q. State where you found your dead goats? A. Well, back on the east side there was a number of them." (Italics ours.)

In view of appellant's right to develop and operate its lease and produce oil it was necessary that it maintain tanks and slush pits. The evidence shows the same were fenced at the time of the trial, but there is no evidence in this record that they were fenced or goat proof at all times during which the appellee claims to have lost his goats. Under such circumstances the appellant insists that as owner of the dominant estate it was not obligated to protect appellee's goats from oil properly produced in the course of its operations and supports such contention with the opinion in Pitzer & West v. Williamson, Tex.Civ.App., 159 S.W.2d 181. It was there held that where plaintiff's sheep were injured by drinking water from slush pits on premises leased

for oil operations, unless there was a duty upon Oil Company lessee to fence the area involved in oil operations, there was no negligence in failing to do so. That is a sound proposition bearing upon the relation these litigants sustained to each other at the time of the alleged injuries. Especially is this so as applied to sources of oil and salt water, other than "leaky oil pipe", since appellee testified that during such time "the slush pit is still in good shape as far as the pit is concerned."

Concerning other conditions apparently not charged to the appellant as negligence during the time material to the inquiries herein, the appellee further testified:

"Q. Since that time (after the veterinary was at appellee's place in November, 1943,) what, if anything, have they done about fencing the slush pit where the oil stood? A. Well, they put a gang to fencing where they found salt water around. Also, where the dam was in the pasture with no dike, they put a gang to fixing the leaky tanks."

Summarizing, the appellee himself testified that oil and salt water had been spouting out of Well No. 2 for 18 months and running down into his pasture; that salt water, oil and B. S. had overflowed the slush pit and dike and his goats had died all over his pasture. That such substances leaked from the "8¼ inch line" and ran "down into the creek on different occasions." That the pit "where the oil stood" had later been fixed as had the dam at the tank; that he had no idea of the particular time a goat died or how many goats died at any one time. He did not testify that he saw any goat drink oil from the leaky pipe line or oil that had leaked therefrom. No other witnesses gave any more specific testimony.

The evidence affirmatively shows that the goats ranged over the entire pasture at the time such oil, salt water, etc., was available to them.

■ Above we have italicized the testimony which indicates various sources of such oil, salt water, etc., available to the goats, other than the "leaky oil pipe line" furnishing the basis of negligence for the special issues submitted. Appellee's own testimony conclusively establishes that his goats could with equal probability have obtained the oil and salt water from such other sources, and it follows he has wholly failed to discharge the burden resting upon him to establish by a preponderance of the evidence that the sole alleged ground of negligence (maintenance of "leaky oil pipe line") relied upon by him proximately caused his damage. He does not demonstrate by his testimony which of two or more probable or equally possible causes inflicted upon him the damages which he seeks to recover. The actual cause or definite amount thereof is left to surmise and speculation. His right to recover upon such state of facts is precluded by the following authorities: Carter v. Simmons, Tex.Civ.App., 178 S.W.2d 743; Mauk v. Texas Pipe Line Co., Tex.Civ.App., 93 S.W.2d 820; Tucker Oil Co. v. Matthews, Tex.Civ.App., 119 S.W.2d 606; Algorde Oil Co. v. Hokanson, Tex.Civ.App., 179 S.W.2d 350; Pitzer & West v. Thigpen, Tex.Civ.App., 68 S.W.2d 324; Gulf Production Co. v. Continental Oil Co., 139 Tex. 183, 132 S.W.2d 553; Sun Oil Co. v. Robicheaux, Tex.Com.App., 23 S.W.2d 713, 715.

In principle we regard the opinion in Carter v. Simmons, supra, as controlling. That case was predicated upon the alleged negligence of appellant in permitting storage tanks on appellee's premises to overflow, proximately causing the death of appellee's cattle drinking oil and salt water escaping therefrom. At the same time like oil and salt water was equally available to the cattle in slush pits where such had accumulated as a necessary incident to the operation of the lease. The opinion proceeds upon the theory that the alleged negligence of the oil and gas lessee in permitting oil and salt water to escape from the storage tanks could not be presumed, and that it was necessary for the appellee in the discharge of the burden resting upon him to prove such negligence and that it was the proximate cause of his loss.

The opinion further holds [178 S.W.2d 747]: "If any or all of appellees' cattle did in fact die as a result of drinking oil which necessarily accumulated in the slush pits as an indispensable incident to the operation of either of the producing wells, then we think it is clear that appellant would not be liable to appellees for such loss. Pitzer & West v. Williamson, supra. Whether the oil which any or all of the lost cattle actually drank came in whole or in part from the slush pits or from the overflowed storage tanks is left entirely to conjecture, surmise and speculation under the evidence in this case. No witness claimed to know or

attempted to testify what the facts were in this regard. Consequently, in our opinion, appellees wholly failed to discharge the burden resting upon them to show by a preponderance of the evidence that the negligence, if any, of appellant in permitting the storage tanks to overflow was the proximate cause of all or any part of the loss. Mauk v. Texas Pipe Line Co., Tex.Civ. App., 93 S.W.2d 820, error dismissed; Tucker Oil Co. v. Matthews, Tex.Civ.App., 119 S.W.2d 606, points 1–3 authorities."

Mauk v. Texas Pipe Line Co., supra, was a suit for damages caused by leakage of oil from a pipe line constructed under a certain easement (lease contract) to defendant lessee, and it was there held the grantor or lessor could not recover for leakage from a line laid under a former and different easement (lease contract) since under the rule the allegata and probata must correspond.

The opinion in that case holds as follows [93 S.W.2d 824]: "Plaintiff's suit was for damages caused from leakage of oil from the pipe lines constructed under his grant to the defendant of the easement of date October 10, 1921, and therefore his claim for damages was limited to leakage from the one line which he testified was the only one laid under that easement. Under his pleading he could not recover for leakage from the line laid under a former easement, under the elementary rule that the allegata and probata must correspond. All the testimony introduced by him was as to the leakage of oil from the two pipe lines across his land considered together, with nothing to show how much from either of those lines, separately from the other, and aside from the probability of leakage from the third pipe line on the land of another and crossing the same ravines. In the absence of evidence on that point, if the case had been submitted to a jury, any finding by them of damages from leakage of oil from the pipe line laid under the easement of date October 10, 1921, necessarily would have been based on a mere surmise or guess, which it would have been the duty of the trial court to set aside for that reason."

That is believed to be a sound conclusion under the facts, and the rule of law is applicable to the facts of the instant case, since oil and salt water was "all over" appellee's pasture, according to his testimony, and equally available to his goats from sources other and different from the leaky

oil pipe line, and the evidence wholly fails to show that the appellee's goats drank oil and salt water solely from the "leaky oil pipe line" or that any definite number of his goats so drank and died as a result thereof. In the last opinion the rule is also employed that the negligence alleged and relied on must be proved and that same cannot be inferred from the mere fact that injury occurred. Jones v. Ft. Worth & D. C. R. Co., 47 Tex.Civ.App. 596, 105 S.W. 1007; International & G. N. R. Co. v. Wilson, Tex.Civ.App., 129 S.W. 849.

Tucker Oil Co. v. Matthews, supra, is a case similar in nature and was an action for death of cattle caused by drinking water polluted with oil, salt water, etc., from defendant's oil wells. Said cattle had access to said oil and salt water from operations other than defendant's. That is, oil and salt water from defendant's operations and oil and salt water from other independent operations could and did drain into same water courses in plaintiff's pasture. In that opinion the court held the evidence did not sustain a judgment against the defendant, since "no testimony was introduced to show how much of such pollution was caused by acts or omissions of the defendant, and what part of which originated from other sources." [119 S.W.2d 607.]

Algorde Oil Co. v. Hokanson, supra, is an opinion by this court and in principle applicable to the facts hereof.

In all of these cases it was held that the judgment below was necessarily based upon mere surmise, conjecture and speculation, which was altogether incompetent to support recovery. Such is the nature of the testimony in the instant case. Based upon appellee's own testimony, it cannot be said that his goats died in whole or in part by reason of drinking oil and salt water from the "leaky oil pipe line," or that any particular goat died from drinking the same. Appellee does not testify that he at any time saw any goat drink oil that had leaked from said pipe line or was leaking from the same. Neither do his other witnesses.

Appellant's points discussed are sustained. Others become immaterial.

The cause has been fully developed. Therefore, for the reasons assigned, and in accordance with the opinions above cited, the judgment of the trial court is reversed and judgment here rendered in favor of the appellant. It is so ordered.