George Kenneth Phoenix and Enola Phoenix, Plaintiffs-Appellees, v. Herman Graham and W. R. McCluskey, Defendants-Appellants.

Term No. 52–O–1.

Opinion filed January 30, 1953.
Released for publication March 4, 1953.

WHAM & WHAM, of Centralia, and MILLER & PFAFF, of Salem, for appellants.

CRAIN & HALL, of Centralia, for appellees.

MR. JUSTICE SCHEINEMAN delivered the opinion of the court.

Plaintiffs, George Kenneth Phoenix and Enola Phoenix, are the owners of a farm of 128 acres. In 1940 they executed an oil and gas lease as to 40 acres, on which drilling brought in four producing wells. The wells also produced salt water, which was separated and deposited in pits dug for the purpose. In 1945 the defendants, Herman Graham and W. R. McCluskey, acquired the oil lease and continued operating for about 5 more years, then plugged and abandoned the wells.

In 1951 the plaintiffs filed this suit for damages, alleging that water wells on the farm had been contaminated with salt water, making them unfit for use, that this had resulted from the negligence of the defendants, and that the farm was without any fresh water. A jury returned a verdict for plaintiffs for $9,500 upon which judgment was entered and this appeal followed.

The grounds urged for reversal are: that there was no proof of negligence on the part of defendants; that plaintiffs acquiesced in the operations as conducted; that the verdict was grossly excessive; also that an alleged rule of the Department of Mines and Minerals was not before the court.

██ ██ As to the last point, the complaint alleged the rule, the answer denied its existence and no proof was offered thereon. Accordingly, the supposed rule was not before the court. If it existed, it could be proved by a copy certified by the Director of the Department. Ill. Rev. St. ch. 104, par. 70, subpar. (d) [Jones Ill. Stats. Ann. 93.122, subpar. (d)].

The evidence was as follows: The lease granted the right to mine for oil and gas and "any and all rights and privileges necessary, incident to or convenient for economical operation." There was no provision concerning damages, except to growing crops.

The first appearance of salt water in the oil wells had occurred within a year after they were brought in. The original lessee had then installed a settling tank, called a gun barrel, in which the oil floated to the top and the salt water was removed from the bottom and diverted into the pits. The first lessee had provided three such pits, and they sometimes overflowed. The volume of salt water increased with passage of time, so that, shortly after defendants took over the operation, they had to dig a new and larger pit. The plaintiffs were consulted about this, and were not

happy over it, but agreed that the proposed location of the new pit was acceptable, and it was constructed.

There is some dispute about the depth to which this pit was excavated, and whether it went down into sand or porous material, which would permit accelerated seepage. There was no expert testimony, or other evidence, as to what other means could have been adopted for disposal of the salt water, while still maintaining profitable operation of the oil wells. Other oil wells in the neighborhood had the same trouble, but nothing is said about methods used there or elsewhere for disposition of the brine.

It appears that plaintiffs' farm buildings were located on the 40-acre tract in question, and they had three water wells in the vicinity. These began to be salty soon after defendants established the large pit, and eventually became unusable. There were no water wells on the other 88 acres not under this lease.

The contaminated wells did not contain water of artesian source, but merely percolating surface water; they were very shallow, being around 13 feet deep. According to an expert witness called by plaintiff, this is rather shallow for good water, since filtration in 12 feet of ground is seldom sufficient to assure pure water. However, it was the only source which plaintiffs had used in their farming operations.

An expert witness for the defense testified to his examination of the log of each oil well on the 40 acres, and they showed the existence of fresh artesian water at various depths, the uppermost being only about 60 feet from the surface. There was also testimony that defendants had caused a letter to be sent to plaintiffs offering to provide them a well into this source of water. Plaintiffs denied receiving any such letter.

In preparation for trial, plaintiffs caused a couple of postholes to be dug and the water tested. These

showed salt in the water at a depth of about 10 feet. They also showed greater contamination to the north than to the south, which agreed with the testimony that the natural drainage was to the north, and the percolating water would follow the same trend. Although the farm extended south from the pit nearly 1,000 feet, no test was made farther south than 150 feet from the pit, and none was made to the west, where plaintiffs' land extended for some 2,000 feet from the pit. There was some indication that plaintiffs had refused to permit defendants to make any tests on the land.

There was an area north of the large pit on which there was surface damage to the land by reason of the pit having overflowed, and a surface pool used by cattle had been rendered too salty for use.

The method of proving the amount of damages was by the testimony of real estate men who gave opinions as to the market value of the property before and after the contamination of the water. Their testimony was not confined to the 40 acres, but pertained to the entire 128 acres. In giving opinions as to the present value of the farm, they apparently assumed that the salt water had permeated the entire farm, and that there was no other source of fresh water reasonably available.

In reply to defendants' assertion that no negligence was proved against them, plaintiffs contend on this appeal that the defendants are liable because of the impounding of the salt water, on the ground they created a nuisance, regardless of negligence. Reference is made to the Illinois statute on nuisances, Ill. Rev. St., ch. 38, sec. 466 [Jones Ill. Stats. Ann. 37.415].

The plaintiffs appear to be asserting a rule of law which applies to a different type of case. It is fairly common for salt water to be encountered with oil, and much litigation has resulted, usually by third parties

331

who complain that the salt water has been sent on their land, or into their streams or wells, from some outside source.

██ In this situation, the decisions are not uniform. Some states, such as Pennsylvania, hold that the salt water may be allowed to flow according to natural drainage, without resulting liability. Others (some by statute) hold that adjoining landowners, and others downstream, have a right to water in its natural quality, both in their wells and in streams in which they have riparian rights. Illinois takes the latter view, as to pollution of waters in general. *Thomas v. Ohio Coal Co.*, 199 Ill. App. 50; *Voss v. Chicago Sandoval Coal Co.*, 165 Ill. App. 565; *Barrett v. Mt. Greenwood Cem. Ass'n*, 159 Ill. App. 385; *Kuhn v. Illinois Cent. R. Co.*, 111 Ill. App. 323. The *Voss* case specifically repudiates the Pennsylvania rule. For collected cases, see note 34 A. L. R. 266.

██ The foregoing authorities all deal with third-party complaints. There are not so many cases involving suits by one who has suffered salt damage from sources on his own land, and apparently there is none reported in Illinois. But in this situation, cases on the subject are practically uniform that the operator is not liable to his lessor for salt-water damage, unless it was caused by negligence in the operations. *Wheeler v. Fisher Oil Co.*, 6 Ohio N. P. 309; *Walters v. Prairie Oil & Gas Co.*, 85 Okla. 77, 204 Pac. 906; *Pure Oil Co. v. Gear*, 183 Okla. 489, 83 P. (2d) 389; *Marland Oil Co. of Oklahoma v. Hubbard*, 168 Okla. 518, 34 P. (2d) 278; *Carter v. Simmons Co.* (Tex. Civ. App.), 178 S. W. (2d) 743; *Texas Pac. Coal & Oil Co. v. Truesdell* (Tex. Civ. App.), 187 S. W. (2d) 418.

██ The Illinois statute on nuisances, like statutes in other states, does not purport to change this principle. In our opinion, the following statement about a

similar Oklahoma statute, shows clearly the reasoning which must be applied to such laws:

"To hold that operators could not flow salt water over the surface of land owned by them or leased by them for that purpose, or to deposit same in pools or tanks on their own land, would in many cases render impossible development for oil and gas in fields where salt water is produced. It would result in depriving the owner of land of the right to use it to his own advantage, where such use would in no way harm or injure others. It is only permitting oil or other inflammable products to escape into pools or tanks for watering stock and located upon the land of others, that the law was intended to prohibit. So with salt water." *Tidal Oil Co. v. Pease,* 153 Okla. 137, 5 P. (2d) 389.

■ To this we add that departmental regulations cannot have the effect of enactment of legislation. Such rules and regulations may provide for details of enforcement, but the power to legislate cannot be delegated. *People ex rel. Chicago Dryer Co. v. City of Chicago,* 413 Ill. 315, 109 N. E. (2d) 201.

■ . It seems to be generally recognized, especially in the large oil-producing states, that salt water in oil wells is a natural evil difficult to handle, and some damage to property may be unavoidable, in spite of the exercise of reasonable care. The proprietor of oil land free from salt water has a natural advantage, and owns a better property than one whose land is subject to the evil. The latter has a burden attached to his ownership, and no logical reason can be given for the law to remove that burden, and give him a better property than he owns, by casting the entire burden on the operator to dispose of the salt at his peril. The burden on the operator is sufficient if he is required to use the reasonable care of an ordinary prudent operator.

333

■■ This is entirely consistent with principles previously applied in this court. In *Benefiel v. Pure Oil Co.*, 322 Ill. App. 5, we held that the oil lessee has the right, in disposing of waste material, to use part of the surface for that purpose so far as reasonably necessary, and that he is not liable for resultant damage, in the absence of negligence. Reference was there made to Summers on Oil & Gas respecting the general rights of an oil lessee to use the surface of lands leased. Accordingly, we hold in the instant case that plaintiffs have the burden of proving defendants were negligent and thereby caused the damage.

■ The evidence in this case in support of the charge of negligence is meager, but we are unable to say there is none at all. For example, the evidence that surface damage resulted from permitting the brine pool to overflow, clearly presents a jury question as to negligence. As to the construction of the large pool, we have some doubt that the charge of negligence is supported by the weight of the evidence, but again we cannot say there is no evidence in favor of plaintiffs in this respect. Accordingly, we cannot reverse without remanding.

■ As to plaintiffs' alleged acquiescence in defendants' conduct, we consider the argument irrelevant. This is again a question whether defendants used the ordinary care and procedure of a prudent operator. To the extent they did, the plaintiffs had no legal basis for objection. But they are not required to consent to negligence, and mere failure to object to the construction of the large pit is not a waiver of claims that the construction was negligently performed.

■ However, we are in agreement with appellants that the amount of damages awarded was grossly excessive. The correct measure of damages was used,

334

i. e., the difference between the market value of the property before and after the injury. But in the application of this rule there was a complete departure from the evidentiary facts. The production of salt water has ceased. There was testimony that the brine in the large pit could be removed, and natural rainfall would tend to purify the area. There was evidence of the existence of artesian fresh water readily available. There was a complete absence of any evidence as to the contamination of the major portion of the farm. Yet, all the testimony as to depreciation in value was based on the unsupported assumption that the whole farm was totally and permanently deprived of any reasonable source of fresh water.

We cannot understand why plaintiffs, claiming the whole farm was ruined, confined their tests used in evidence to the 40 acres leased by defendants, and even there, in comparative close range of the pool. Tests at greater intervals would surely be more enlightening. And some weight must be given the evidence as to available artesian water, a condition by no means uncommon or unlikely. We are somewhat skeptical that an Illinois farm must depend entirely upon rain water 13 feet below the surface as the only available supply. Certainly, the expert witnesses and the jury had no right to conjecture that such a condition existed.

For the reasons given, the case is reversed and remanded with directions to award a new trial.

*Reversed and remanded.*

BARDENS, P. J. and CULBERTSON, J., concur.