MICHIGAN OIL COMPANY v NATURAL RESOURCES
COMMISSION

Docket No. 59088. Argued May 3, 1978 (Calendar No. 5).—Decided
March 1, 1979. Rehearing denied *post*, p 1121. Certiorari denied
by the Supreme Court of the United States December 3, 1979.

The Supervisor of Wells denied Michigan Oil Company a drilling
permit for certain property in the Pigeon River State Forest to
which Michigan Oil had obtained oil and gas rights by assign-
ment of an interest in a lease from the Department of Natural
Resources. Michigan Oil appealed to the Natural Resources
Commission, and the Pigeon River Association intervened. The
Natural Resources Commission affirmed the denial after a
hearing before an examiner. The Ingham Circuit Court,
Thomas L. Brown, J., affirmed. The Court of Appeals, M. J.
Kelly, P.J., and Bronson, J. (Peterson, J. dissenting), affirmed
on the ground that the action constituted a statutorily permit-
ted exercise of the authority of the Natural Resources Commis-
sion (Docket No. 24747). Plaintiff appeals. *Held:*

The judgment of the Court of Appeals is affirmed.

Justice Blair Moody, Jr., with Justices Williams and Fitzger-
ald concurring, wrote for affirmance:

The Court must determine whether the oil conservation act
or the legislation creating the Department of Conservation
provides sufficient statutory authority to justify the denial of a

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 4, 7] 61 Am Jur 2d, Pollution Control § 79.
  38 Am Jur 2d, Gas and Oil §§ 100, 101, 154, 157.
[3, 9, 10, 13, 14, 20] 38 Am Jur 3d, Gas and Oil § 157.
[5, 25] 61 Am Jur 2d, Pollution Control §§ 11-13, 82.
[6, 10, 28] 38 Am Jur 2d, Gas and Oil § 283.
  61 Am Jur 2d, Pollution Control § 79.
[8, 12, 26-28] 61 Am Jur 2d, Pollution Control §§ 15, 115.
[11, 12] 61 Am Jur 2d, Pollution Control § 119.
[15] 38 Am Jur 2d, Gas and Oil §§ 157, 298.
[16, 19, 21-24] 38 Am Jur 2d, Gas and Oil §§ 100, 101, 157, 283.
[17] 49 Am Jur 2d, Landlord and Tenant § 922.
[18] 38 Am Jur 2d, Gas and Oil §§ 116, 119.
  Duty of oil or gas lessee to restore surface of leased premises. 65
  · ALR2d 1356.

drilling permit on state-owned land. In addition, the Court is asked to determine whether the Michigan Environmental Protection Act should be read *in pari materia* with the oil conservation act.

1. Michigan Oil claims that the clear import of the oil conservation act is not to conserve the environment in general but to conserve only oil and gas so that they are efficiently extracted. The oil conservation act should not be construed to permit oil and gas drilling unnecessarily detrimental to the other natural resources of this state. The letter which denied the application for a drilling permit referred to oil and gas operations at the Corwith 1-22 drilling site causing "serious damage to animal life" rather than the statutory language of "unnecessary damage to or destruction of animal life". However, the statutory words, "unnecessary damage" or "destruction", clearly apply to the facts of this case. The uncontradicted evidence established that the proposed drilling site is located in the midst of Michigan's elk range, that the elk herd which inhabits this area is the last sizeable wild elk herd east of the Mississippi River, and that oil and gas operations would cause the elk to avoid the area surrounding such operations, resulting in the reduction in the range and habitat of the elk and a decline in the population of the herd. Oil and gas production would have the same effect on bear and bobcat.

2. Reading into the phrase "waste in * * * its ordinary meaning" the modifying language "as those words are generally understood in the oil business" clearly ignores the specific wording of the oil conservation act. When the Legislature defined "underground waste" and "surface waste" it specifically referred to the oil business. On the other hand, the Legislature omitted any reference to the oil business in defining ordinary "waste". Therefore, the ordinary use of the term "waste" does not refer only to waste of oil or gas, but includes any spoliation or destruction of the land, including flora and fauna, by one lawfully in possession, to the prejudice of the estate or interest of another. Serious damage to the wildlife of the Corwith 1-22 drilling site resulting from oil drilling is spoliation or destruction that impairs state-owned lands and the estate therein of the people of Michigan.

3. Other statutory provisions show that the oil conservation act should be construed liberally to allow the Natural Resources Commission to prevent serious environmental damage. For example, the legislative declaration of policy in § 1 of the act makes it appear reasonable to ascribe a broad meaning to "conservation" as used in that section. Conservation should not

be read to apply only to the efficient extraction of oil, but should include the efficient extraction of oil which simultaneously conserves the other natural resources (flora and fauna) of the state. The reference in § 23 to the Department of Natural Resources demonstrates that the Legislature did not draft this act in a vacuum, intending to sacrifice all other natural resources in an effort to discover and produce oil and gas. The oil conservation act requires a construction which allows the Natural Resources Commission to prevent serious environmental damage when reviewing drilling permit applications for state-owned land.

4. Section 6 of the oil conservation act requires the Supervisor of Wells to deny a drilling permit to prevent waste, including serious or unnecessary damage to or destruction of wildlife, even in the absence of specific rules and regulations. The proposed drilling at Corwith 1-22 poses such a threat to the survival of wildlife already found in limited numbers in a limited area of the state, and falls within the statutory definitions of ordinary waste and surface waste. Any other construction of the act would seriously undermine the statutory duty of the Department of Natural Resources and its predecessor the Conservation Department to protect and conserve the natural resources of Michigan.

5. The order of the Natural Resources Commission also refers to the conservation act of 1921 which specifically authorized the commission to purchase land on behalf of the people of the state, under which approximately 65% of the public lands in the Pigeon River Forest was purchased with fish and game protection funds. The commission decided that if the Department of Natural Resources had not opposed the plaintiff's application for a drilling permit it would have failed to perform its statutory duty to protect and conserve natural resources and game under the conservation act of 1921. The denial was based upon specific policy guidelines for issuance of drilling permits, formulated by the Department of Natural Resources, adopted by the Natural Resources Commission pursuant to § 2 of the conservation act, and issued in an intra-agency directive from the Director of Natural Resources. Section 2, as opposed to § 3a, neither provided a criminal sanction nor required the Natural Resources Commission to promulgate rules and regulations. Section 2 creates licensing and leasing powers in the Natural Resources Commission and authorizes rulemaking within a policy-making setting. Section 3a is concerned with wrongful use and occupancy of state-owned land and is designed to provide sanctions against poachers and trespassers. Therefore,

the Natural Resources Commission acted within its statutory authority in denying the drilling permit under the specific guidelines adopted by it.

6. It is unnecessary to decide whether the Environmental Protection Act must be read in pari materia with the oil conservation act. However, if a decision on that issue were required, it is logical to conclude that the Environmental Protection Act should be read in pari materia with other statutes relating to natural resources because it specifically refers to "any alleged pollution, impairment or destruction of the air, water or other natural resources".

Justice Kavanagh, writing for affirmance, would not subscribe to a construction of the oil conservation act which would limit the duty of the Department of Natural Resources to protect the whole environment as it is affected by the drilling of oil wells. There is adequate evidentiary support for the Natural Resources Commission's determination that drilling the proposed well would result in damage to animal life. Its conclusion that this amounts to the waste included in the proscription of the statute comports with Justice Kavanagh's understanding of the legislative intent in writing this law. While it is true that the express, primary concern of the oil conservation act is the prevention of waste of oil itself, the act cannot be read as ignoring, let alone approving, all incidental damage to other natural resources.

Affirmed.

Justice Levin, with Chief Justice Coleman concurring, would reverse the decision of the Court of Appeals, extend the lease, and remand to the Natural Resources Commission for a hearing under the Environmental Protection Act. The Department of Conservation act and the oil conservation act do not constitute sufficient statutory authority to justify the denial of a permit in this case. The oil conservation act is not to be read in pari materia with the Michigan Environmental Protection Act.

1. The Department of Natural Resources argues that the plaintiff's application for a drilling permit was denied primarily to allow the department sufficient time to develop a comprehensive scheme of management for oil drilling and exploration in the Pigeon River Country State Forest and, because such a plan has since been developed and agreed to by other lessees, that the controversy is moot and that the Court should direct the plaintiff to reapply for a drilling permit. The issue is whether the Department of Natural Resources had adequate grounds for denying the permit. If the grounds were inade-

quate, the plaintiff should be granted the permit sought in its application. The Department of Natural Resources management plan is, by its terms, an agreement entered into by the department and other owners of oil leases in the Pigeon River area. The plaintiff is not a party to that agreement and the agreement has no legal effect on its rights. The plaintiff's lease, by its terms, expired on October 31, 1978, because no oil or gas was produced. Therefore, the Court must, in all events, determine whether, if the plaintiff has been wrongfully denied a drilling permit, it should be granted an extended lease term in which to apply for a permit.

2. The provisions of the Department of Conservation act concerning the powers and duties of the Natural Resources Commission with respect to the use and occupancy of lands and property under its control grant the commission the power to promulgate appropriate rules and regulations in accordance with the Administrative Procedures Act. The commission's "Policy Governing the Review of Applications for Permits to Drill for Oil and Gas in the State of Michigan" was not promulgated in accordance with the APA. The policy relates to "use or occupancy" and thus is required under § 3a of the Department of Conservation act to be promulgated pursuant to the APA. Furthermore, the adoption of any rule or regulation under § 2 of the Department of Conservation act is, by virtue of the provisions of the APA itself, subject to the APA. Therefore, whatever the authority the Natural Resources Commission may have under the Department of Conservation act to promulgate such rules and regulations, the authority has not been exercised in the manner required by the act, and denial of the permit cannot be premised on unpromulgated policy.

3. Even assuming that the oil conservation act, and the rules and regulations promulgated under it, empower the commission to deny a drilling permit in contemplation of anticipated waste, waste within the meaning of the act has not been established. The oil conservation act was not designed to insure balanced conservation of all natural resources but, rather, to insure conservation "with a view to the ultimate recovery of the maximum production" of oil and gas. The primary purpose of the act is to prevent waste of oil and gas so as to insure such maximum production. The damage or destruction which the commission found would occur can only constitute waste under the oil conservation act to the extent it is i) waste within the ordinary meaning of that term, ii) "surface waste" as those words are generally understood in the oil business, or iii) unnecessary damage to or destruction of the surface, soils,

animal, fish or aquatic life or property from or by oil or gas operations.

The potential damage found by the Natural Resources Commission does not constitute waste within the ordinary meaning of that term. It is not use, but abuse, that is waste. Waste is a tort which may briefly and very generally be defined as the destruction, misuse, alteration, or neglect of premises by one lawfully in possession, to the prejudice of the estate or interest of another in the premises. The incidental and unpreventable effects of prudent and careful drilling are not abuse or waste of the remainder of the state's proprietary interest since the state as owner of the estate has, by lease, granted the right to drill for oil to the plaintiff; the state cannot complain of damage to its proprietary interest resulting from anticipated conduct. It is of the nature of waste that it shall have been committed without legal right. A lessee has a right to use the leasehold in a manner reasonably necessary to effectuate the purposes of the lease, though damage may result. An oil and gas lease is said to carry within its implications, if not within its expression, such rights as to the surface as may be necessarily incident to performance of the objects of the contract, because a grant or reservation of minerals would be wholly worthless if the grantee or reserver could not enter upon the land in order to explore for and extract the minerals granted or reserved. Thus, an oil and gas lessee is entitled to use the surface of the premises embraced by his oil and gas lease *without liability for surface damage* caused by his operations on the leasehold, so long as such use and the manner of its exercise are reasonably necessary to effectuate the purposes for which the lease was made. The lease given to the plaintiff was made for "the sole and only purpose of drilling, boring, mining and operating for oil and gas". Although use of the surface of the land by the lessee results in death and injury to wildlife belonging to the lessor, that use is not waste within the "ordinary meaning" of the term if it is reasonably necessary for oil and gas operations.

The potential damage found by the Natural Resources Commission does not constitute "surface waste" as those words are generally understood in the oil business. "Surface waste" as those words are generally understood in the oil business does not include "damage to or destruction of the surface, soils, animal, fish or aquatic life". Rather, *surface waste refers to waste of oil and gas that occurs when it is brought to the surface.*

The potential damage found by the Natural Resources Commission does not constitute *"unnecessary* damage * * * or

destruction" under the terms of the oil conservation act. A determination of necessity or lack of it must be made with respect to the purposes of the statute. The relevant provision of the oil conservation act is stripped of its meaning if the term "unnecessary" is to be defined solely by reference to the mere fact of damage to or destruction of the surface, soils, animal, fish or aquatic life or property from or by oil and gas operations. Rather, "unnecessary" must be interpreted in conjunction with the stated purpose of the oil conservation act to prevent waste of oil and gas and to "foster the development of the industry along the most favorable conditions and with a view to the *ultimate recovery of the maximum production of these natural products"*. Whether damage is unnecessary must be determined with respect to the legislatively mandated goal of maximum recovery of oil and gas through prevention of their waste. The act indicates an intention to differentiate unnecessary damage from mere damage, no matter how severe the latter may be. Whether oil and gas production is "necessary" was affirmatively answered by the act itself and by the various acts authorizing the Natural Resources Commission to select state lands for oil and gas leasing. In determining unnecessary damage to or destruction of the surface, soils, animal, fish or aquatic life or property from or by oil and gas operations it is not pertinent whether or not the oil is itself necessary. Whether damage is unnecessary must be determined in the context of the expressed purpose of the act to maximize the recovery of oil through prevention of its waste. The hearing examiner found that the plaintiff will conduct its drilling in a careful and prudent manner, so that no damage will be inflicted upon the environment except that necessarily caused by oil drilling, and that finding has not been disputed by the Natural Resources Commission, the intervenor, the circuit court, or the Court of Appeals; the Natural Resources Commission erred in its construction of the statute and, on the facts of this case, had no authority to deny a permit.

4. The Environmental Protection Act is substantively supplementary to existing administrative and regulatory procedures provided by law, and provides an independent procedural route available in all cases. Thus, the substantive and procedural deficiencies or limitations of other legislation notwithstanding, the Environmental Protection Act is, in itself and without any need for reading it *in pari materia* with other statutes, adequately protective of the environment. The act requires that if a violation is alleged the defendant be explicitly notified that its actions are being challenged under and pursuant to the act.

This accords with ordinary notions of orderly procedures. The Supreme Court is not empowered to direct the Attorney General or the NRC to raise issues under the Environmental Protection Act. The provisions of the act authorizing other persons to intervene in administrative proceedings or to commence an independent action protect against official indifference.

5. The environmental issues were triable under the Environmental Protection Act. The intervenor inartfully sought to raise those issues in its petition to intervene, but did not state them in its pretrial statement, either because intervention was allowed on condition that no new issue would be raised or because it thought such issues could be raised under the oil conservation act or for other reasons. A more appropriate disposition of this case would be to reverse the decision of the Court of Appeals and remand to the NRC for consideration of the Environmental Protection Act claims.

6. In both this case and *West Michigan Environmental Action Council v Natural Resources Commission,* the oil companies took the position that the environmental issue was not raised and triable, and in both cases the trier of fact agreed with them on the triable issue and concluded that any impact of drilling on the ecology was not a valid reason for refusing to permit the drilling to proceed. In both cases, on review, after the evidentiary record was closed, the trier of fact was reversed on the question of triable issue. As a consequence, the oil companies have not had an opportunity, after the ruling against them on triable issue, to offer rebuttal evidence on the question of environmental damage. The evidence in both cases is incomplete and imprecise, raising as many questions as it answers. In both cases, leasehold rights granted by the state and large expenditures of time and money by the oil companies in reliance on those rights are dismantled without an adequate opportunity, after the triable issue has been definitively stated, to test the real worth of the environmental claims. The lease should be extended for the time that elapsed between the denial of the permit and the expiration of the lease, and the case remanded to the Natural Resources Commission for a hearing under the Environmental Protection Act.

Justice Ryan agreed with Justice Levin's conclusion that neither the Department of Conservation act nor the oil conservation act constitute sufficient statutory authority for denial of the drilling permit in this case. He also agreed that Michigan Oil's lease should be extended, but would remand the case to the circuit court for a hearing under the Environmental Protec-

tion Act. The Court in *West Michigan Environmental Action Council* has permanently enjoined the drilling of ten exploratory wells in the same area of the Pigeon River Country State Forest in which this plaintiff is seeking permission to drill. The basis for decision in *West Michigan* was that the evidence adduced demonstrated that the drilling of wells in this area of the forest would likely result in an impairment or destruction of the elk in violation of the Environmental Protection Act. Because of the decision in *West Michigan* the provisions of the Environmental Protection Act cannot be ignored in deciding this case. The apparent failure of the Department of Natural Resources to adequately discharge its statutory responsibility to the people to protect and conserve the natural resources of the state by its failure to raise the Environmental Protection Act in this case should not have precluded consideration of the act. He would agree with Justice Levin in extending plaintiff's lease and would remand this case to the circuit court for proceedings under the Environmental Protection Act.

71 Mich App 667; 249 NW2d 135 (1976) affirmed.

OPINION BY BLAIR MOODY, JR., J.

1. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — OIL AND GAS OPERATIONS — NATURAL RESOURCES.

*The oil conservation act should not be construed to permit oil and gas drilling unnecessarily detrimental to the other natural resources of the state (MCL 319.1 et seq.; MSA 13.139[1] et seq.).*

2. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — ANIMALS — WASTE.

*The words "unnecessary damage" or "destruction" of animal life within the meaning of the oil conservation act clearly apply where the uncontradicted evidence established that a proposed drilling site in a state forest is located in the midst of Michigan's elk range, that the elk herd which inhabits the area is the last sizable wild elk herd east of the Mississippi River, that oil and gas operations would cause the elk to avoid the area surrounding such operations, resulting in the reduction in the range and habitat of the elk and a decline in the population of the herd, and that oil and gas production would have the same effect on bear and bobcat (MCL 319.2; MSA 13.139[2]).*

3. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — WASTE — WORDS AND PHRASES.

*The Legislature defined "underground waste" and "surface*

waste" in the oil conservation act to specifically refer to the oil business, but omitted any reference to the oil business in referring to the "ordinary meaning" of waste; therefore, the ordinary use of the term "waste" does not refer only to waste of oil or gas, but includes any spoliation or destruction of the land, including flora and fauna, by one lawfully in possession, to the prejudice of the estate or interest of another (MCL 319.2; MSA 13.139[2]).

4. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — PUBLIC LANDS — WASTE — WORDS AND PHRASES.

Serious damage to the wildlife of a drilling site in a state forest resulting from oil drilling is spoliation or destruction that impairs state-owned lands and the estate therein of the people of Michigan within the meaning of the oil conservation act (MCL 319.2; MSA 13.139[2]).

5. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — CONSERVATION — WORDS AND PHRASES.

The oil conservation act should be construed liberally to allow the Natural Resources Commission to prevent serious environmental damage; the legislative declaration of policy in the act makes it appear reasonable that "conservation" should not be read to apply only to the efficient extraction of oil, but should include the efficient extraction of oil which simultaneously conserves the other natural resources (flora and fauna) of the state (MCL 319.1; MSA 13.139[1]).

6. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — DRILLING PERMITS — ENVIRONMENTAL DAMAGE — PUBLIC LANDS.

The Legislature did not draft the oil conservation act in a vacuum, intending to sacrifice all other natural resources in an effort to discover and produce oil and gas; the oil conservation act requires a construction which allows the Natural Resources Commission to prevent serious environmental damage when reviewing drilling permit applications for state-owned land (MCL 319.1 et seq.; MSA 13.139[1] et seq.).

7. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — DRILLING PERMITS — WASTE.

The oil conservation act requires the Supervisor of Wells to deny a drilling permit to prevent waste, including serious or unnecessary damage to or destruction of wildlife, even in the absence of specific rules and regulations (MCL 319.6; MSA 13.139[6]).

8. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — ENVIRON-
   MENTAL PROTECTION ACT — STATUTES — CONSTRUCTION.
   *The Environmental Protection Act should be read* in pari materia
   *with all legislation relating to natural resources, e.g., the oil
   conservation act, because they relate to the same class of
   persons or things and have a common purpose (MCL 319.1 et
   seq., 691.1201 et seq.; MSA 13.139[1] et seq., 14.528.[201] et
   seq.).*

CONCURRING OPINION BY KAVANAGH, J.

9. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — STATUTES
   — CONSTRUCTION — DRILLING PERMITS.
   *The oil conservation act should not be construed to limit the duty
   ' of the Department of Natural Resources to protect the whole
   environment as it is affected by the drilling of oil wells; while it
   is true that the express, primary concern of the oil conserva-
   tion act is the prevention of waste of oil itself, the act cannot
   be read as ignoring, let alone approving, all incidental damage
   to other natural resources (MCL 319.1 et seq.; MSA 13.139[1] et
   seq.).*

10. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — DRILL-
    ING PERMITS — WASTE — ANIMALS.
    *A determination by the Natural Resources Commission that
    drilling a proposed oil well on public lands would result in
    damage to animal life, which has adequate evidentiary support,
    and that this amounts to the waste included in the proscription
    of the oil conservation act comports with the apparent legisla-
    tive intent in writing the act (MCL 319.1 et seq.; MSA 13.139[1]
    et seq.).*

DISSENTING OPINION BY LEVIN, J.

11. HEALTH AND ENVIRONMENT — CONSERVATION ACT OF 1921 —
    ADMINISTRATIVE PROCEDURES ACT — DRILLING PERMITS.
    *The Natural Resources Commission's policy concerning applica-
    tions for drilling permits is not enforceable because it is a rule
    within the meaning of the Administrative Procedures Act but
    was not promulgated in accordance with that act (MCL 24.201
    et seq., 299.2; MSA 3.560[101] et seq., 13.2).*

12. HEALTH AND ENVIRONMENT — CONSERVATION ACT OF 1921 —
    ADMINISTRATIVE PROCEDURES ACT — DRILLING PERMITS.
    *Denial of a permit to drill for oil on state-owned land cannot be
    premised on a policy of the Natural Resources Commission*

which was not promulgated under the Administrative Procedures Act; whatever authority the Natural Resources Commission has under the Department of Conservation act to promulgate rules and regulations for the prevention of damage to animals and forest ecosystems from oil drilling has not been exercised in the manner required by the act (MCL 24.201 et seq., 299.2; MSA 3.560[101] et seq., 13.2).

13. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — WASTE — WORDS AND PHRASES.

Damage or destruction can only constitute waste under the oil conservation act to the extent it is i) waste within the ordinary meaning of that term, ii) "surface waste" as those words are generally understood in the oil business, or iii) unnecessary damage to or destruction of the surface, soils, animal, fish or aquatic life or property from or by oil or gas operations (MCL 319.2; MSA 13.139[2]).

14. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — LEGISLATIVE INTENT.

The oil conservation act was not designed to insure balanced conservation of all natural resources but, rather, to insure conservation "with a view to the ultimate recovery of the maximum production" of oil and gas; the primary purpose of the act is to prevent waste of oil and gas so as to insure maximum production (MCL 319.1 et seq.; MSA 13.139[1] et seq.).

15. WASTE — WORDS AND PHRASES.

Waste is a tort which may briefly and very generally be defined as the destruction, misuse, alteration, or neglect of premises by one lawfully in possession, to the prejudice of the estate or interest of another in the premises; it is not use, but abuse, that is waste.

16. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — WASTE — WORDS AND PHRASES.

The incidental and unpreventable effects of prudent and careful drilling by an oil lessee on state-owned land are not abuse or waste of the remainder of the state's proprietary interest within the meaning of the oil conservation act since the state as owner of the estate has, by lease, granted the right to drill for oil to the lessee; the state cannot complain of damage to its proprietary interest resulting from anticipated conduct (MCL 319.2; MSA 13.139[2]).

17. WASTE — LANDLORD AND TENANT.

*It is of the nature of waste that it shall have been committed without legal right; a lessee has a right to use the leasehold in a manner reasonably necessary to effectuate the purposes of the lease, though damage may result.*

18. WASTE — OIL AND GAS LEASES.

*An oil and gas lease is said to carry within its implications, if not within its expression, such rights as to the surface as may be necessarily incident to performance of the objects of the contract, because a grant or reservation of minerals would be wholly worthless if the grantee or reserver could not enter upon the land in order to explore for and extract the minerals granted or reserved; thus, an oil and gas lessee is entitled to use the surface of the premises embraced by his oil and gas lease without liability for surface damage caused by his operations on the leasehold, so long as such use and the manner of its exercise are reasonably necessary to effectuate the purposes for which the lease was made.*

19. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — WASTE — WORDS AND PHRASES.

*Use of the surface of public lands by an oil and gas lessee which results in death and injury to wildlife belonging to the lessor is not waste within the "ordinary meaning" of that term under the oil conservation act if it is reasonably necessary for oil and gas operations; a lessee does not abuse or misuse the estate granted when it carefully and prudently exercises the rights specifically granted to it (MCL 319.2; MSA 13.139[2]).*

20. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — SURFACE WASTE — WORDS AND PHRASES.

*"Surface waste" under the oil conservation act as those words are generally understood in the oil business does not include "damage to or destruction of the surface, soils, animal, fish or aquatic life"; rather, surface waste refers to waste of oil and gas that occurs when it is brought to the surface (MCL 319.2; MSA 13.139[2]).*

21. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — UNNECESSARY DAMAGE — WORDS AND PHRASES.

*The prohibition of the oil conservation act of "unnecessary" damage must be interpreted in conjunction with the stated purpose of the oil conservation act to prevent waste of oil and gas and to "foster the development of the industry along the most favorable conditions and with a view to the ultimate recovery of the maximum production of these natural prod-*

ucts"; *whether damage is unnecessary must be determined with respect to the legislatively mandated goal of maximum recovery of oil and gas through prevention of their waste (MCL 319.2; MSA 13.139[2]).*

22. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — UNNECESSARY DAMAGE — WORDS AND PHRASES.

*The oil conservation act indicates an intention to differentiate unnecessary damage from mere damage, no matter how severe the latter may be; whether oil and gas production is "necessary" was affirmatively answered by the act itself and by the various acts authorizing the Natural Resources Commission to select state lands for oil and gas leasing (MCL 319.2; MSA 13.139[2]).*

23. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — UNNECESSARY DAMAGE — WORDS AND PHRASES.

*In determining under the oil conservation act whether unnecessary damage to or destruction of the surface, soils, animal, fish or aquatic life or property will result from or by oil and gas operations it is not material whether or not the oil is itself necessary; whether damage is unnecessary must be determined in the context of the expressed purpose of the act to maximize the recovery of oil through prevention of its waste (MCL 319.2; MSA 13.139[2]).*

24. HEALTH AND ENVIRONMENT — OIL CONSERVATION ACT — DRILLING PERMITS — WASTE.

*The Natural Resources Commission had no authority to deny a plaintiff a drilling permit under its lease of the oil rights on certain state-owned lands where the hearing examiner found that the plaintiff will conduct its drilling in a careful and prudent manner, so that no damage will be inflicted upon the environment except that necessarily caused by oil drilling, and that finding has not been disputed (MCL 319.2; MSA 13.139[2]).*

25. HEALTH AND ENVIRONMENT — ENVIRONMENTAL PROTECTION ACT — STATUTES — CONSTRUCTION.

*The Environmental Protection Act is substantively supplementary to existing administrative and regulatory procedures provided by law, and provides an independent procedural route available in all cases; thus, the substantive and procedural deficiencies or limitations of other legislation notwithstanding, the Environmental Protection Act is, in itself and without any need for reading it* in pari materia *with other statutes, ade-*

quately protective of the environment (MCL 691.1201 et seq.; MSA 14.528[201] et seq.).

26. HEALTH AND ENVIRONMENT — ENVIRONMENTAL PROTECTION ACT — PARTIES — STANDING.

The Environmental Protection Act requires that if a violation is alleged the defendant be explicitly notified that its actions are being challenged under and pursuant to the act, which accords with ordinary notions of orderly procedures; the Supreme Court is not empowered to direct the Attorney General or the Natural Resources Commission to raise issues under the Environmental Protection Act because the act authorizes other persons to intervene in administrative proceedings or to commence an independent action should a governmental agency fail to raise environmental issues (MCL 691.1201 et seq.; MSA 14.528[201] et seq.).

27. HEALTH AND ENVIRONMENT — ENVIRONMENTAL PROTECTION ACT — PUBLIC LANDS — OIL AND GAS DRILLING.

The environmental issues of damages to state-owned lands and natural resources by permitting the holder of an oil and gas lease to drill for gas and oil on the land are triable under the Environmental Protection Act (MCL 691.1201 et seq.; MSA 14.528[201] et seq.).

OPINION CONCURRING IN PART AND DISSENTING IN PART BY RYAN, J.

28. HEALTH AND ENVIRONMENT — ENVIRONMENTAL PROTECTION ACT — DRILLING PERMITS.

The apparent failure of the Department of Natural Resources to adequately discharge its statutory responsibility to the people to protect and conserve the natural resources of the state by its failure to raise the Environmental Protection Act in a case concerning an application for an oil and gas drilling permit on state-owned land should not have precluded consideration of the act; the provisions of the act cannot be ignored in deciding the case because the Supreme Court, in another case, has permanently enjoined the drilling of ten exploratory wells in the same area of the state-owned land in which the plaintiff is seeking permission to drill, and the basis for decision in the other case was that the evidence adduced demonstrated that the drilling of wells in this area would likely result in an impairment or destruction of the elk in violation of the Environmental Protection Act (MCL 299.1 et seq., 319.1 et seq., 691.1201 et seq.; MSA 13.1 et seq., 13.139[1] et seq., 14.528[201] et seq.).

*Honigman, Miller, Schwartz & Cohn* (by *Jason
L. Honigman* and *John Sklar;* and *Lynch, Gal-
lagher & Lynch,* of counsel) for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, and *Stewart H.
Freeman* and *Thomas F. Schimpf,* Assistants At-
torney General, for defendants.

*Berkey, Erickson, Rentrop & Martin* (by *Gary R.
Rentrop* and *Samuel K. Hodgdon;* and *Philip
Soper,* of counsel) for intervening defendant Pi-
geon River Country Association.

BLAIR MOODY, JR., J. The issue before the Court
is whether the Natural Resources Commission
(NRC) properly denied Michigan Oil's permit ap-
plication for oil and gas drilling on a 40-acre site
of state-owned land known as Corwith 1-22 in July
of 1972. Beyond this apparently simple question
are broad policy considerations; therefore, it is
necessary to fully understand the factual setting of
the instant case before addressing the legal issues
set forth.

## BACKGROUND

Corwith 1-22, the 40-acre site involved in the
instant controversy, is located in the Pigeon River
Country State Forest (hereinafter the Pigeon River
Forest or Forest) which consists of 92,872 acres of
rolling hills, deep swamps, high forests, lakes and
streams. Located in Otsego and Cheboygan Coun-
ties, the Pigeon River Forest is one of the largest
remaining tracts of publicly owned, wild, undevel-
oped land in the lower peninsula. Two of the
state's highest quality trout streams, the Pigeon
and Black Rivers, flow through the Forest. The

Pigeon River Forest provides one of the few remaining favorable habitats in the lower peninsula for wildlife, including bear, bobcat, beaver, woodcock, osprey, eagle, and many other birds and animals.

The Forest is also the home of the largest remaining elk herd east of the Mississippi River. In fact, Section 22, containing Corwith 1-22, is in the heart of a 25-square-mile area of semi-wilderness which is the favored habitat of the elk harem.

Another natural resource, oil, one which provides great opportunity for profit, has also been found in the Forest. Thus, in 1968, when the Department of Natural Resources (DNR) sold oil and gas leases covering more than one-half million acres of state-owned land in the northern lower peninsula, it is not surprising that more than 10% or 57,669 of those acres were located in the Pigeon River Forest. As a consequence, more than one-half of this special Forest was leased for gas and oil development. Prior to the sale of the leases, no environmental assessment was made of the property to be leased. In fact, the regional office of the DNR was given only nine days to review the almost 600,000 acres prior to the proposed sale. The DNR received $1,122,788 from the 1968 auction of oil and gas leases, or an average of $2.06 an acre.

The first permit to drill on state-owned land in the Pigeon River Forest, pursuant to a 1968 lease, was issued in May of 1970. On September 16, 1970, after only two drilling permits had been issued, Governor William G. Milliken urged the NRC to establish a moratorium on the issuance of drilling permits for state land because of his "great concern about potential environmental intrusion and encroachment from oil and gas drilling in this

important scenic forest area". During this morato-
rium the NRC instructed the DNR to launch field
studies to pinpoint areas of special wildlife signifi-
cance and unusual natural value, in an effort to
develop a comprehensive management plan for the
Pigeon River Forest. Until a comprehensive plan
could be developed, permit applications were re-
viewed on an individual basis to determine
whether drilling would destroy natural resources.
Subsequent to the moratorium, drilling permits
were granted for state-owned land only in areas
already damaged by oil development. During and
subsequent to the moratorium, permits were is-
sued for drilling on private land. Nevertheless, no
drilling permit was issued within the 25-square-
mile area surrounding Corwith 1-22, the proposed
drilling site involved in the present controversy.

### Corwith 1-22

State of Michigan Oil and Gas Lease No. 9656,
covering 1,760 acres of Corwith Township includ-
ing the 160 acres comprising the southeast 1/4 of
Section 22 was purchased by Pan American Petro-
leum Corporation. In December of 1968, Pan
American assigned an undivided 50% interest in
this lease to Northern Michigan Exploration Com-
pany and Amoco Production Company. In April of
1971, Northern Michigan Exploration and Amoco
applied for a permit to drill a well on the south-
west 1/4 of the southeast 1/4 of Section 22 of
Corwith Township, a 40-acre site. On October 11,
1971, the Supervisor of Wells denied the applica-
tion on the grounds that oil and gas drilling on the
site would cause "serious and unnecessary dam-
age" to various wildlife in the area, the swamp in
the area would be affected, and the drilling would
cause a "serious intrusion into a nearly solid block

of semi-wilderness area of state lands". The denial specifically stated that *no* site in the 40 acres was acceptable. No appeal was made from this permit denial.

With full knowledge of this denial, because of his membership on the Oil and Gas Advisory Board of the Supervisor of Wells, Vance W. Orr, Vice President of McClure Oil Company and President of Michigan Oil Company, accepted on behalf of McClure Oil an assignment of the lease rights to this 40-acre site in Section 22 of Corwith Township. "[F]or and in consideration of the sum of One Dollar ($1.00) * * * and other valuable considerations", Northern Michigan Exploration and Amoco assigned to McClure Oil Company their interest in Lease No. 9656 covering the 40-acre site in Section 22. Four months later, in May of 1972, McClure Oil entered into a contract with its wholly-owned subsidiary, Michigan Oil Company. Under the terms of the contract, Michigan Oil would receive assignment of the leasehold interest, if Michigan Oil could obtain a drilling permit and then drill a commercial producing well on the 40-acre site referred to as Corwith 1-22.

### The Drilling Permit

Within two weeks of the contract agreement, Michigan Oil filed the second application for a permit to drill a well on Corwith 1-22. This second application was also denied by the Supervisor of Wells, in a letter dated July 21, 1972. In addition to noting the earlier denial of Northern Michigan Exploration and Amoco's application to drill on the same 40-acre site, the letter to Michigan Oil stated:

*"Oil and gas operations at the above site cannot be*

*conducted without causing or threatening to cause seri-
ous damage to animal life and molesting or spoiling
state-owned lands. * * **

"This area was originally leased on October 1, 1968.
Due to our increased awareness of quality environment,
and increased success in oil and gas exploration, I
firmly believe this area would not have been offered for
lease today.

\* \* \*

"[T]he Natural Resources Commission has asked that
we set up a forest management plan to preserve the
special quality environment now present.

"Such a plan would establish a broad management
policy for the area, identifying kinds of management
programs and uses to be permitted. It would involve
zoning of areas, each differing in intensity or type of
use to be permitted. Preparation of this plan is under
way at the present time and should be completed
within six months, including time for public hearings.
For this reason it is appropriate that the present appli-
cation be denied. You may also expect me to direct
denial of all other applications for drilling permits in
the area under study, pending drafting of and action on
the management plan.

"With reference to the present application I make the
following specific points.

"The proposed drilling site is located in a 40-acre
tract within a township about 93 percent state owned
and hence almost entirely in a wild state. Similar
conditions prevail in the townships to the north and
south. This surrounding area is primitive in nature,
largely wooded, with minimal development. The roads
are narrow, winding, and highly scenic. *The proposed
site is near the center of the Michigan elk range. The
area has substantial populations of game—white-tailed
deer, ruffed grouse, and woodcock, and relict popula-
tions of wildlife requiring extensive little-disturbed,
wild areas such as black bears, bobcats, bald eagles,
pileated woodpeckers, and ravens. All of the latter are
scarce or very local in occurrence in the Lower Penin-
sula.*

*"Development for oil or gas has not yet reached this secluded area."* (Emphasis added.)

With nothing to lose and everything to gain, Michigan Oil, the potential assignee of McClure Oil's leasehold interest, appealed the denial of its permit application to the NRC. The NRC appointed a hearing examiner to conduct the administrative hearing. The Pigeon River Country Association intervened under the Michigan Environmental Protection Act (MEPA), MCL 691.1205(1); MSA 14.528(205)(1). The hearing examiner ruled, however, that the intervention was untimely and that the environmental protection act could not be raised. The examiner further ruled that the parties were limited to issues raised by the initial parties in their pretrial statements.

The hearing examiner filed a written report, adopting almost verbatim Michigan Oil's proposed findings of fact and conclusions of law, recommending that the drilling permit be issued. The NRC, after reviewing the record, the briefs and the proposed findings of fact, rejected the recommendations of the hearing examiner and upheld the denial of Michigan Oil's application for a drilling permit. On May 9, 1974, the NRC issued its decision specifically finding the following:

"Damage to the ecosystem and *serious or unnecessary damage to animals would be caused* by opening entrance roads, truck traffic, succession of wells and general activities encountered in all oil-gas production. Particularly, serious effects would be caused to elk, bear and bobcat and could cause their virtual removal from a portion of the Pigeon River area. The tendency of the animals would be to avoid the area. Such effect would be particularly noticeable in the case of elk who are a wide ranging animal (Moran, T-2142; Harger, T-2243; Black, T-1331, 1332, 1333, 1352; Moore, T-1710; John-

son, T-1782, 1784-1786, 1819, 1924; Strong, T-1823, 1824).

"The Pigeon River area is the last stronghold of the bear and bobcat. Places where bear and bobcat can live are limited. Section 22 is good bear habitat (Johnson, T-1786, 1823; Harger, T-2246).

"*Elk would be particularly affected by an oil operation because of their fragile nervous system and even clearing one acre will affect them.* In turn, many small animals would be affected (Johnson, T-1823; Strong, T-1888, 1889; Moran, T-2152).

"*The above testimony from game biologists as to the effect of the drilling of a well in this area comes from the DNR presentation and the opinions of their experts are unrebutted on the record. On considering the foregoing testimony the Commission must find that* damage to or *destruction of the* surface, soils, *animals,* fish or aquatic life *will occur.*" (Emphasis added.)

On appeal, the denial of the drilling permit for Corwith 1-22 was affirmed by the Ingham Circuit Court and by the Court of Appeals. *Michigan Oil Co v Natural Resources Comm,* 71 Mich App 667; 249 NW2d 135 (1976).

On April 20, 1977, this Court issued an order denying Michigan Oil leave to appeal. 399 Mich 892 (1977). Subsequently, on July 14, 1977, Michigan Oil received a third appeal of the drilling permit denial when this Court, on reconsideration, granted leave to appeal. 400 Mich 843 (1977).

## DISCUSSION

Thus, within this factual setting, the Court must determine whether the Natural Resources Commission had the statutory authority to deny Michigan Oil's application for a drilling permit on the 40-acre site known as Corwith 1-22 in the Pigeon River Forest. Specifically, we must decide whether the oil conservation act, 1939 PA 61, as amended,

MCL 319.1 *et seq.;* MSA 13.139(1) *et seq.,* or the legislation which created the Department of Conservation, the DNR's predecessor, 1921 PA 17, as amended, MCL 299.1 *et seq.;* MSA 13.1 *et seq.,* provides sufficient statutory authority to justify the denial of a drilling permit in the instant case. Additionally, we are asked to determine whether the Michigan environmental protection act should be read *in pari materia* with the oil conservation act.

### 1939 PA 61

At the crux of this litigation is the question of the proper interpretation of the oil conservation act, 1939 PA 61, and the question of the nature of the authority granted to the Supervisor of Wells and the NRC to deny the issuance of a permit to drill on state-owned lands pursuant to oil and gas leases. Appellant, Michigan Oil, claims that 1939 PA 61 only empowers the Supervisor of Wells to withhold issuance of a drilling permit to prohibit waste which is unnecessary to the production of oil and gas. The statute, therefore, would impliedly protect any and all other waste, no matter how serious, if necessarily incidental to the production of oil and gas. According to the appellant, the clear import of 1939 PA 61 was not to conserve the environment in general but to conserve only oil and gas so that they are efficiently extracted.

Neither the circuit court nor the Court of Appeals would accept this exceedingly narrow construction of the statute. We also reject a construction of the oil conservation act which would permit oil and gas drilling unnecessarily detrimental to the other natural resources of this state.

Under the statute before amendment in 1973, waste is defined "in addition to its ordinary mean-

ing" to include "the unnecessary damage to or destruction of the surface, soils, animal, fish or aquatic life or property from or by oil and gas operations". MCL 319.2(1)(2)(2); MSA 13.139(2)(1)(2)(2). We are urged to find that the NRC exceeded its statutory authority because the letter denying Michigan Oil's application for a drilling permit referred to oil and gas operations at Corwith 1-22 causing "serious damage to animal life" rather than the statutory language of "unnecessary damage to or destruction of animal life".

We refuse to adopt this narrow, semantic analysis. Surely, if the Director of Natural Resources and the Supervisor of Wells in the denial letter dated July 21, 1972 had a crystal ball they would have used the statutory word "unnecessary" instead of "serious" to modify damage. The statutory words, "unnecessary damage" or "destruction", clearly apply to the correct findings of the Court of Appeals:

"*The uncontradicted evidence below established that the proposed drill site is located in the midst of Michigan's elk range, that the elk herd which inhabits this area is the last sizeable wild elk herd east of the Mississippi River, and that oil and gas operations would cause the elk to avoid the area surrounding such operations, resulting in the reduction in the range and habitat of the elk and the decline in the population of the herd.* Uncontradicted evidence established that oil and gas production activities would have the same effect on bear and bobcat, and that the area presently provides one of the few remaining favorable locations for bear and bobcat in lower Michigan. These factual findings are amply supported by the record and indicate that the proposed drilling poses a serious threat to the survival of wildlife already found only in limited numbers in a limited area of the state." *Michigan Oil, supra,* 686-687.

Furthermore, we agree with the Court of Appeals interpretation concerning the ordinary meaning of waste:

"We are not prepared to hold that the 'ordinary meaning' of the term waste cannot include even the most serious permanent damage to or destruction of any and all natural resources of the state incidental to the production of oil." *Michigan Oil, supra,* 685-686.

The definitional section of the act relative to waste provided in part:

"(l) *As used in this act, the term 'waste' in addition to its ordinary meaning shall include:*
"(1) *'Underground waste' as those words are generally understood in the oil business, and in any event to embrace* (1) the inefficient, excessive, or improper use or dissipation of the reservoir energy, including gas energy and water drive, of any pool, and the locating, spacing, drilling, equipping, operating, or producing of any well or wells in a manner to reduce or tend to reduce the total quantity of oil or casing-head gas ultimately recoverable from any pool, and (2) unreasonable damage to underground fresh or mineral waters, natural brines, or other mineral deposits from operations for the discovery, development, and production and handling of oil or casing-head gas.
"(2) *'Surface waste,' as those words are generally understood in the oil business, and in any event to embrace* (1) the unnecessary or excessive surface loss or destruction without beneficial use, however caused, of casing-head gas, oil, or other product thereof, but including the loss or destruction, without beneficial use, resulting from evaporation, seepage, leakage or fire, especially such loss or destruction incident to or resulting from the manner of spacing, equipping, operating, or producing well or wells, or incident to or resulting from inefficient storage or handling of oil, (2) the unnecessary damage to or destruction of the surface, soils, animal, fish or aquatic life or property from or by oil

and gas operations; and (3) the drilling of unnecessary wells." MCL 319.2; MSA 13.139(2). (Emphasis added.)

Appellant would have us read into the phrase "waste in * * * its ordinary meaning" the modifying language "as those words are generally understood in the oil business". Such interpretation clearly ignores the legislation's specific wording. When the Legislature defined "underground waste" and "surface waste" it specifically referred to the oil business. On the other hand, the Legislature omitted any reference to the oil business when including ordinary waste in the definitional section. Therefore, the ordinary use of the term "waste" does not refer only to waste of oil and gas, but includes any spoilation or destruction of the land, including flora and fauna, by one lawfully in possession, to the prejudice of the estate or interest of another. Serious damage to the wildlife of Corwith 1-22 resulting from oil drilling is spoilation or destruction that impairs state-owned lands and the people of Michigan's estate therein.

We would construe the oil conservation act liberally, to allow the NRC to prevent serious environmental damage, on the basis of additional statutory provisions. For example, although § 1, declaring the policy of the oil conservation act, addresses itself primarily to conservation of oil deposits, it clearly declares:

"Failure to adopt such a policy in the pioneer days of the state permitted the unwarranted slaughter and removal of magnificent timber abounding in the state, which resulted in an immeasurable loss and waste. * * * To that end this act is to be construed liberally in order that effect may be given to sound policies of conservation and the prevention of waste and exploitation." MCL 319.1; MSA 13.139(1).

It appears reasonable that a broad meaning can be ascribed to a definition of conservation as used in the declaration of policy section. Conservation should not be read to apply only to the efficient extraction of oil, but should include the efficient extraction of oil which simultaneously conserves the other natural resources (flora and fauna) of the state. Support for this interpretation can be found in § 23 of the act which provided until its amendment by 1973 PA 61:

"[N]o permit shall be issued to any owner or his authorized representative who has not complied with or is in violation of this act, or *any of the rules, regulations, requirements or orders issued by the supervisor, or the department of conservation.*" MCL 319.23; MSA 13.139(23). (Emphasis added.)

This specific reference to the DNR's predecessor in the oil conservation act demonstrates that the Legislature did not draft this act in a vacuum, intending to sacrifice all other natural resources in an effort to discover and produce oil and gas. To the contrary, this reference to the Department of Conservation implicitly mandates a statutory construction of the oil conservation act which allows the NRC to prevent serious environmental damage when reviewing drilling permit applications for state-owned land.

Despite this cross-referencing, appellant, Michigan Oil, contends that no rules and regulations existed in 1972 related to prevention of "unnecessary damage to or destruction of * * * wildlife". However, § 6 of the oil conservation act indicates that the Supervisor of Wells has the authority to deny a drilling permit to prevent waste without

the aid of specific rules and regulations:[1]

"The supervisor shall prevent the waste prohibited by this act. To that end, acting directly or through his authorized representatives, *the supervisor * * * is specifically empowered * * * to do whatever may be necessary* with respect to the subject matter stated herein *to carry out the purposes of this act, whether or not indicated, specified, or enumerated in this or any other section hereof.*" MCL 319.6; MSA 13.139(6). (Emphasis added.)

Accordingly, we find, as did the NRC, the circuit court and the Court of Appeals, that: (1) the oil conservation act placed an affirmative duty on the Supervisor of Wells to prevent waste, including serious or unnecessary damage to or destruction of wildlife, even in the absence of specifically promulgated rules and regulations; and (2) the proposed drilling at Corwith 1-22 poses a serious threat to the survival of wildlife already found only in limited numbers in a limited area of the state, and this serious threat falls within the statutory definitions of ordinary waste and surface waste which includes the unnecessary damage to or destruction

---

[1] Support for this position can be found in a 1970-71 rule promulgated under § 6 of the oil conservation act granting to the Supervisor of Wells authority to do whatever may be necessary, even when not specified in the act or specific rules and regulations. 1970-71 AACS R 299.2101 provides in relevant part:

"*The supervisor,* by virtue of section 6 of Act No. 61 of the Public Acts of 1939, as amended:

"(a) *May* enforce all rules and regulations, issue orders and instructions necessary to enforce such rules and regulations, and *do whatever may be necessary* with respect to the subject matter stated in the rules and regulations *to carry out the purposes of the rules and regulations and of the act itself, whether or not such orders or instructions are indicated, specified or enumerated in the act or the rules and regulations.*"

Thus, this rule gave the Supervisor of Wells the power to deny the drilling permit based upon rationale appropriate under the act, without regard to enumerated rules and regulations. See also 1963 AACS R 299.2101.

of animal life. As indicated *infra,* any other finding would seriously undermine the affirmative statutory duty of the DNR and its predecessor the Conservation Department to "protect and conserve the natural resources of the State of Michigan". MCL 299.3; MSA 13.3.

## 1921 PA 17

In denying Michigan Oil's application for a drilling permit, the Natural Resources Commission did not rely solely on the authority of the oil conservation act of 1939. The order of the NRC also refers to the conservation act of 1921, 1921 PA 17 as amended, MCL 299.1 *et seq.;* MSA 13.1 *et seq.* Through this act, the Legislature established the predecessors of the NRC and the DNR to "provide for the protection and conservation of the natural resources of the state". Preamble, 1921 PA 17, as amended by 1927 PA 337. The commission (NRC) was specifically authorized to purchase land "on behalf of the people of the state" and the department (DNR) was given the affirmative duty to "protect and conserve the natural resources of the state of Michigan". MCL 299.3; MSA 13.3. Pursuant to this authority, the commission purchased approximately 65% of the now publicly-owned land in the Pigeon River Forest. The purchase and management of the Pigeon River Forest was funded by the fish and game protection fund pursuant to MCL 314.12; MSA 13.1361.

This background is necessary to understand why the NRC, in upholding the Supervisor of Wells denial of the permit, found that if the department had not opposed the application for permit it would have failed in the performance of its duty to protect and conserve natural resources and game pursuant to 1921 PA 17. This conservation act

empowers the commission to enter into contracts for the taking of oil and gas and to make and enforce reasonable rules and regulations concerning the use and occupancy of lands and properties under its control. MCL 299.2; MSA 13.2. In this connection, § 23 of the oil conservation act, *supra,* becomes significant, by requiring that no permit be issued to any driller who has not complied with or is in violation of any "rules, regulations, requirements or orders" of the Supervisor or the Department of Conservation, the DNR.

The denial of a drilling permit by the NRC in the instant case was not based upon promulgated rules and regulations. The denial was based, however, upon specific guidelines formulated by the DNR and adopted by the Natural Resources Commission on June 11, 1971. These guidelines, entitled "Policy Governing the Review of Applications for Permits to Drill for Oil and Gas in State of Michigan", were issued in an intra-agency directive from the Director of Natural Resources to all supervisory personnel and specifically provided that:

> "*A drilling permit will be denied when the Supervisor of Wells finds that oil and gas operations cannot be conducted without causing or threatening to cause serious or unnecessary damage to or destruction of* the surface, soils, *animal,* fish or aquatic *life* or property." (Emphasis added.)

Therefore, pursuant to its power under MCL 299.2; MSA 13.2, and based upon § 23 of the oil conservation act, which mandated that no permit be issued in violation of "requirements", *i.e.,* guidelines, of the DNR, the NRC refused to issue a drilling permit for Corwith 1-22 since such drilling would cause serious or unnecessary damage to or

destruction of the elk, bear and bobcat populations.

Appellant Michigan Oil contends since MCL 299.3a; MSA 13.4, which grants to the NRC the power to promulgate appropriate rules and regulations, explicitly requires that such rules be promulgated in accordance with the Administrative Procedures Act, 1943 PA 88, as amended, the same requirement is applicable to § 2, MCL 299.2; MSA 13.2. This contention overlooks the basic differences between §§ 2 and 3a. Section 3a provides a criminal sanction in that:

"The commission of conservation *shall* make such rules *for protection of the lands* and property *under its control against wrongful use or occupancy* as will insure the carrying out of the intent of this act to protect the same from depredations and to preserve such lands and property from molestation, spoilation, destruction or any other improper use or occupancy. Nothing herein contained shall be deemed as allowing the commission of conservation to make any rule which applies to commercial fishing except as provided by law. Rules affecting the use and occupancy of such lands and property shall be promulgated in accordance with Act No. 88 of the Public Acts of 1943, as amended, being sections 24.71 to 24.80 of the Compiled Laws of 1948, and subject to Act No. 197 of the Public Acts of 1952, as amended, being sections 24.101 to 24.110 of the Compiled Laws of 1948. *A violation of any such rule is a misdemeanor.*" 1968 PA 199, MCL 299.3a; MSA 13.4. (Emphasis added.)

The criminal sanction of § 3a mandates promulgated rules and regulations. Furthermore, the first sentence of § 3a uses the word "shall", thereby requiring the NRC to promulgate rules and regulations.

Section 2, on the other hand, neither provided a criminal sanction nor ordered the NRC to act:

"The commission hereby created *may* adopt such rules and regulations, not inconsistent with law, governing its organization and procedure, and the administration of the provisions of this act, as may be deemed expedient. Said commission *may* also make and enforce reasonable rules and regulations concerning the use and occupancy of lands and property under its control." 1963 PA 204, § 1, MCL 299.2; MSA 13.2. (Emphasis added.)

Furthermore, the 1975 and 1976 amendments to § 2, inapplicable in the instant case, did not alter the previously mentioned differentiations. Finally, a distinction as to scope should be noted. Section 2 creates licensing and leasing powers in the NRC and authorizes rulemaking within a policy-making format. Section 3a is concerned with wrongful use and occupancy of state-owned land and is designed to provide sanctions against poachers and trespassers.

Based upon this analysis, we can only conclude that the NRC acted within its authority under § 2, MCL 299.2; MSA 13.2, in denying the drilling permit based upon the specific guidelines formulated by the DNR and adopted by the NRC in 1971.

Notwithstanding the foregoing reasoning, a 1970-71 promulgated rule did provide the Supervisor of Wells with authority to deny the drilling permit in the instant case.[2]

## *MEPA*

Having concluded that 1939 PA 61 and 1921 PA 17 provide statutory authority for denial of the drilling permit in the instant case, it is unnecessary to decide whether the Michigan environmen-

---

[2] See footnote 1, *supra.*

tal protection act, MCL 691.1201 *et seq.;* MSA 14.528(201) *et seq.,* must be read *in pari materia* with the oil conservation act. Nevertheless, if an answer to this question were required, we would hold that the Michigan environmental protection act should be read *in pari materia* with all legislation relating to natural resources.

The rationale for such a holding can be found in *Detroit v Michigan Bell Telephone Co,* 374 Mich 543, 558; 132 NW2d 660 (1965); *app dis and cert den* 382 US 107; 86 S Ct 256; 15 L Ed 2d 191 (1965):

"Statutes *in pari materia* are those which relate to the same person or thing, or the same class of persons or things, or which have a common purpose. It is the rule that in construction of a particular statute, or in the interpretation of its provisions, all statutes relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law, although enacted at different times, and containing no reference one to the other."

See also *State Highway Comm v Vanderkloot,* 392 Mich 159, 182; 220 NW2d 416 (1974) (opinion by WILLIAMS, J.).

Since the MEPA specifically speaks to "any alleged pollution, impairment or destruction of the air, water or other natural resources", it is logical that the MEPA should be read *in pari materia* with other statutes relating to natural resources.

CONCLUSION

Having determined that in 1972 the Natural Resources Commission had statutory authority to properly deny Michigan Oil's request for a drilling permit in the Pigeon River Forest, we affirm the

decisions of the circuit court and the Court of Appeals.

WILLIAMS and FITZGERALD, JJ., concurred with BLAIR MOODY, JR., J.

KAVANAGH, J. *(to affirm).* I would affirm the Court of Appeals.

I cannot subscribe to a construction of the oil conservation act which would limit the DNR's duty to protect the whole environment as it is affected by the drilling of oil wells.

There is adequate evidentiary support for the commission's determination that drilling the proposed well would result in damage to animal life.

Its conclusion that this amounts to the waste included in the proscription of the statute comports with my understanding of the legislative intent in writing this law. While it is true the express, primary concern of the oil conservation act is with the prevention of waste of oil itself, I cannot read the act as ignoring, let alone approving, all incidental damage to other natural resources.

LEVIN, J. *(dissenting).* The issue is whether the Natural Resources Commission, the governing body of the Department of Natural Resources, properly denied Michigan Oil, the holder of an oil and gas lease granted by the state, a permit to drill for oil and gas.

We would hold that

1) The present controversy is not moot. The DNR's management plan for the Pigeon River Country State Forest (PRCSF), developed by agreement with other lessees, to which Michigan Oil is not a party, after denial of Michigan Oil's applica-

tion for a permit, does not resolve impropriety in the denial of its application in 1972. Since no oil or gas was produced by October 31, 1978, Michigan Oil's lease, in terms, expired on that date; the merits must be addressed to determine whether Michigan Oil, by reason of the delays engendered by the DNR's denial of a permit, should be granted an extended lease term.

2) The Department of Conservation act[1] does not justify denial of a permit in the present case. While the act authorizes the adoption of rules and regulations concerning "use and occupancy of lands and property", no rule or regulation was adopted authorizing denial on the ground asserted by the DNR.

3) Nor does the oil conservation act[2] justify denial of a permit. Damage to or destruction of surface, soils, animal, fish or aquatic life from oil or gas operations is not waste within the meaning of the act if it is reasonably necessary to careful and prudent oil and gas operations.

4) The oil conservation act is not *in pari materia* with the environmental protection act. The environmental protection act fulfilled the Legislature's responsibilities under Const 1963, art 4, § 52. That act establishes independent substantive and procedural bases for the commencement of actions and for intervention in administrative proceedings. The act may be invoked only in accordance with its provisions.

We would reverse the Court of Appeals, extend Michigan Oil's lease for the time between the denial of its application for a drilling permit and

---

[1] 1921 PA 17, as amended; MCL 299.1 *et seq.;* MSA 13.1 *et seq.*

Statutes quoted herein read as they did at the time applicable to this case, although some later revisions or amendments may have been made.

[2] 1939 PA 61, as amended, MCL 319.1 *et seq.;* MSA 13.139(1) *et seq.*

October 31, 1978, and remand to the NRC for a hearing under the environmental protection act.[3]

I

The DNR offered at public auction in August, 1968, oil and gas leases to state-owned lands, including Corwith 1-22, the proposed drill site. Bids totalling $1,122,788 were accepted for oil and gas leases covering 546,196.89 acres. The NRC and State Administrative Board approved the leases. In October, 1968, the state entered into an oil and gas lease with Pan-American Petroleum Corporation.[4] So much of the lease as covers Corwith 1-22 was by mesne assignments transferred to the McClure Oil Company which farmed the lease out to Michigan Oil, a wholly-owned subsidiary.

Michigan Oil's application for a permit to drill,

---

[3] Michigan Oil further claims that if the statutes invoked by the DNR authorize it to deny a permit, they and the denial constitute an unconstitutional taking of the value of the lease. The issue has been extensively briefed and argued and was one of the questions on which leave to appeal was granted. Our disposition makes it unnecessary to decide the issue.

[4] The granting clause of the lease declared:

" 'C.' Said lessor for and in consideration of a cash bonus in hand paid * * * has granted, demised, leased and let, and by these presents does grant, demise, lease and let, without warranty, express or implied, unto the said lessee for the sole and only purpose of drilling, boring, mining and operating for oil and gas, and acquiring possession of and selling the same, and for laying pipelines and building tanks, power stations, and structures thereon, necessary to produce, save, and take care of such products, all those certain tracts of land * * *."

Paragraph G of the lease provided that the lessor reserves the right to use the premises leased, "but not to the detriment of the rights and privileges herein specifically granted". Paragraph H stated, "this lease shall be subject to the rules and regulations of the Department of Conservation now or hereafter enforced relative to such leases, all of which rules and regulations are made a part and condition of this lease; provided, that no rules or regulations made after the approval of this lease shall operate to affect the term of lease, rate of royalty, rental, or acreage, unless agreed to by both parties". The lease was for a term of ten years "and as long thereafter as oil and/or gas are produced in paying quantities".

filed May 31, 1972 pursuant to § 23 of the oil conservation act, was denied July 21, 1972. The denial was appealed to the NCR in accordance with § 3 of the act. The NRC assigned a hearing examiner.

Approximately one week before the hearing, the Pigeon River Country Association sought to intervene under the Department of Conservation act, the oil conservation act, and the environmental protection act.[5] The issues to be heard had been earlier agreed to in meetings between the parties of record, Michigan Oil and an Assistant Attorney General representing the DNR. Intervention was allowed on the condition that intervenor could not raise issues not theretofore stated in the pretrial proceedings; the effect of the environmental protection act upon the application for a permit was not among those issues. The intervenor asserted at the hearing and on appeal that the environmental protection act is assimilated into the oil conservation act and the Department of Conservation act.[6]

The examiner filed his findings of fact and conclusions of law on October 11, 1973. He found that the drilling of the well at the proposed site would have "no significant effect as to the soil, surface, fish or aquatic life" and concluded that no waste or unnecessary damage would result from granting the permit. The examiner also found that "[i]t has been established by the testimony that Michigan Oil Company will drill the state-Corwith 1-22 in a careful and prudent manner under the supervision of the DNR and in compliance with all applicable rules and regulations". The examiner recommended that the permit be granted.

Objections to the examiner's report were filed by

---

[5] MCL 691.1201 et seq.; MSA 14.528(201) et seq.

[6] See fn 1, supra.

the Attorney General's office in behalf of the DNR and by counsel for intervenor. The matter was submitted to the NRC on the record before the examiner.

The NRC rejected the examiner's recommendation and denied Michigan Oil's application for a permit, and on May 9, 1974 adopted findings of fact and conclusions of law. The NRC stated that "[d]amage to the ecosystem and serious or unnecessary damage to animals would be caused by opening entrance roads, truck traffic, succession of wells and general activities encountered in all oil-gas production. Particularly serious effects would be caused to elk, bear, and bobcat and could cause their virtual removal from a portion of the Pigeon River area. * * * [T]he commission must find that damage to or destruction of the surface, soils, animals, fish or aquatic life will occur". Stating that "[t]he department is required to protect and conserve natural resources and game pursuant to [the Department of Conservation act]", the commission ordered that "[t]he action of the Supervisor of Wells in denying the drilling permit is upheld on the ground that to permit drilling will cause waste and constitute violation of [the Department of Conservation act and the oil conservation act]". The commission did not disagree with the examiner's conclusion that Michigan Oil would drill in a careful and prudent manner.

Michigan Oil appealed the order denying a permit to the Ingham Circuit Court which affirmed. The Court of Appeals also affirmed the denial, one judge dissenting.

## II

The DNR alleges that the controversy is moot and should be dismissed. It acknowledges that the

primary reason Michigan Oil's application for a permit was denied was to allow the DNR sufficient time to develop a comprehensive scheme of management for oil drilling and exploration in the PRCSF. It now argues that because such a management plan was thereafter developed and agreed to by other lessees, this Court should direct Michigan Oil to reapply for a permit. It states that it will not now deny a permit on the grounds on which the 1972 denial was based.

The relief Michigan Oil has requested is an order directing the DNR to grant it a permit. The issue is whether the DNR had adequate grounds for denying a permit. If the grounds for denial were inadequate, Michigan Oil should be granted the permit sought in its 1972 application.

The consent order is, in terms, an agreement entered into by the DNR and other owners of oil leases in the area. Michigan Oil is not a party to that agreement, and it has no legal effect on the rights of Michigan Oil. Michigan Oil's right to drill for oil must be determined by the provisions of its lease and applicable law. It cannot be precluded from seeking to exercise its rights because the DNR subsequently agreed with other lessees to limitation of the provisions of their leases.

Michigan Oil's lease in terms expired on October 31, 1978 because no oil or gas was produced. We must therefore, in all events, turn to the merits of the controversy to determine whether Michigan Oil has been wrongfully denied a permit, and whether an extended lease term in which to apply for a permit should therefore be granted to it.

III

The NRC affirmed the denial of the drilling

permit "on the ground that to permit drilling will
cause waste and constitute violation of" the oil
conservation act read in light of the NRC's respon-
sibilities under the Department of Conservation
act.

The disposition we think proper makes it unnec-
essary to consider whether the proofs support the
conclusion that "the denial served to prevent the
destruction or spoilation of state lands". In this
connection we note that neither of the opinions for
affirmance in this Court discusses the question of a
standard for judging environmental claims under
the oil conservation act and Department of Conser-
vation act; nor do they relate the evidence to the
stated conclusion that potential damage justifying
denial of a permit was shown.

Section 2 of the Department of Conservation act
provides that the NRC "may also make and en-
force reasonable rules and regulations concerning
the *use and occupancy of lands and property* un-
der its control".[7] Section 3a of the act provides
that "[t]he commission of conservation shall make
such *rules* for *protection of the lands* and property
under its control against *wrongful use or occu-
pancy* as will insure the carrying out of the intent
of this act to protect the same from depredations
and to preserve such lands and property from
molestation, spoilation, destruction or any other
improper use or occupancy * * *. * * * *Rules*
affecting the *use and occupancy* of such lands and
property *shall* be promulgated in accordance with"
the Administrative Procedures Act.[8] (Emphasis
added.)

The Department of Conservation act thus grants
the commission the power to promulgate appropri-

[7] MCL 299.2; MSA 13.2.
[8] MCL 299.3a; MSA 13.4.

ate rules and regulations in accordance with the Administrative Procedures Act.[9] No such rule or regulation providing authority to deny a permit because of threatened "damage to the ecosystem and serious or unnecessary damage to animals" from drilling was adopted.

The NRC's "Policy Governing the Review of Applications for Permits to Drill for Oil and Gas in State of Michigan", relied on by the DNR, was not promulgated in accordance with the APA. The argument that rules and regulations adopted pursuant to § 2 of the oil conservation act need not be promulgated in accordance with the APA because the explicit requirements of § 3a do not apply to § 2 is insubstantial.

Section 3a was added to the act to spell out the manner in which the NRC may exercise its responsibility under the entire act. Its provisions are mandatory and apply to § 2: "The commission of conservation *shall* make such rules and regulations * * * [emphasis supplied]."[10] Rules or regulations adopted by the NRC prohibiting "wrongful use or occupancy" must be formally adopted pursuant to the APA as provided in § 3a.

The policy relied on by the DNR states as its purpose the protection of "public and private lands and related natural resources of the state from unnecessary damage, or destruction, and further to prevent unreasonable molestation, spoilation or destruction of state owned land under its jurisdiction and control", and thus relates to "use or occupancy" and is required under § 3a to be promulgated pursuant to the APA.

Moreover, whether § 3a modifies § 2 or not, the adoption of any rule or regulation under § 2 is, by

---

[9] 1943 PA 88, as amended; superseded by MCL 24.201 *et seq.;* MSA 3.560(101) *et seq.*

[10] MCL 299.3a; MSA 13.4.

virtue of provisions of the APA itself, subject to the APA. Whether termed a rule, regulation, requirement, guideline, or order, any "agency regulation, statement, standard, policy, ruling or instruction of general applicability, which implements or applies law enforced or administered by the agency",[11] must be promulgated in accordance with the APA requirements of notice, hearing and publication.

No policy has the force of law unless it is promulgated pursuant to the APA as a rule. A rule becomes effective on the date fixed in the rule "which shall not be earlier than 15 days after the date of its promulgation".[12] Until the rule thus becomes effective it has no force or effect and the substantive law that the agency is charged with administering and enforcing remains unchanged. The policy relied on by the DNR to deny Michigan Oil's permit, to which it is otherwise entitled by the provisions of its lease and the statutes, was not enforceable because it was a rule within the meaning of and had not been promulgated in accordance with the APA.

We therefore conclude that whatever authority the NRC has under the Department of Conservation act to promulgate rules and regulations for the prevention of damage to animals and forest ecosystems from oil drilling has not been exercised in the manner required by the act, and therefore denial of the permit cannot be premised on the unpromulgated policy.[13]

---

[11] MCL 24.207; MSA 3.560(107).

[12] MCL 24.247(1); MSA 3.560(147)(1).

[13] Intervenor suggests that an opinion of the Attorney General, OAG, 1971-1972, No. 4718, p 17 (April 6, 1971), construes the Department of Conservation act as an independent basis for review and denial of permit applications. While the opinion does indicate that the commission may proscribe oil and gas operations in specified areas under its control, it does not suggest that such proscription may be

## IV

Turning to the oil conservation act, the NRC concluded "on considering the foregoing testimony the commission must find that damage to or destruction of the surface, soils, animals, fish or aquatic life will occur".

Assuming that the oil conservation act empowers the NRC to deny an application in contemplation of anticipated waste, including "unnecessary damage to or destruction of the surface, soils, animal, fish or aquatic life or property from or by oil and gas operations", we conclude that waste within the meaning of the act has not been established.[14]

---

accomplished without the promulgation of appropriate rules and regulations.

[14] The oil conservation act empowers the Supervisor of Wells

"(a) To make and enforce rules and regulations subject to the approval of the commission, issue orders and instructions necessary to enforce such rules and regulations and *to do whatever may be necessary with respect to the subject matter stated herein* to carry out the purposes of this act, whether or not indicated, specified, or enumerated in this or any other section hereof." MCL 319.6; MSA 13.139(6) (emphasis supplied).

It is unclear whether "subject matter stated herein" refers only to the other subsections of MCL 319.6; MSA 13.139(6), or whether it refers to the entire act.

Section 23 of the act provides:

"Upon receiving such written application and payment of the fee required, the supervisor shall within 5 days thereafter issue to any owner or his authorized representative, a permit to drill such well: Provided, however, That no permit to drill a well shall be issued to any owner or his authorized representative who does not comply with the rules, regulations and requirements or orders made and promulgated by the supervisor: And provided further, That no permit shall be issued to any owner or his authorized representative who has not complied with or is in violation of this act, or any of the rules, regulations, requirements or orders issued by the supervisor, or the department of conservation." MCL 319.23; MSA 13.139(23).

No suggestion has been made that Michigan Oil has not complied with any rule, regulation, requirement or order promulgated by the Supervisor of Wells or the NRC. Indeed, there is no indication that any rule or regulation extant in 1972 related to the prevention of surface waste as defined in § 2 of the act.

Section 2(1) of the oil conservation act states that the term waste includes[15] (i) the "ordinary meaning" of that term, (ii) " 'surface waste', as those words are generally understood in the oil business", and (iii) surface waste in any event embraces "*unnecessary* damage to or destruction of the surface, soils, animal, fish or aquatic life or property from or by oil or gas operations". (Emphasis supplied.)

The ordinary meaning of the term waste means unauthorized damage to the estate or interest of another proprietor; no such damage has been shown. Surface waste as that term is generally understood in the oil and gas business means waste of oil or gas once or as it is brought to the surface; concern about such waste is not the impetus for this litigation. The principal issue is the

[15] "[T]he term 'waste' in addition to its ordinary meaning shall include

"(1) 'Underground waste' as those words are generally understood in the oil business, and in any event to embrace (1) the inefficient, excessive, or improper use or dissipation of the reservoir energy, including gas energy and water drive, of any pool, and the locating, spacing, drilling, equipping, operating, or producing of any well or wells in a manner to reduce or tend to reduce the total quantity of oil or casing-head gas ultimately recoverable from any pool, and (2) unreasonable damage to underground fresh or mineral waters, natural brines, or other mineral deposits from operations for the discovery, development and production and handling ·of oil or casing-head gas.

"(2) 'Surface waste', as those words are generally understood in the oil business, and in any event to embrace (1) the unnecessary or excessive surface loss or destruction without beneficial use, however caused, of casing-head gas, oil or other product thereof, but including the loss or destruction, without beneficial use, resulting from evaporation, seepage, leakage or fire, especially such loss or destruction incident to or resulting from the manner of spacing, equipping, operating, or producing well or wells, or incident to or resulting from inefficient storage or handling of oil, (2) the unnecessary damage to or destruction of the surface, soils, animal, fish or aquatic life or property from or by oil and gas operations; and (3) the drilling of unnecessary wells.

"(3) 'Market waste', which shall embrace the production of oil in any field or pool in excess of the market demand as defined herein." MCL 319.2(l); MSA 13.139(2)(l).

meaning of "unnecessary damage" to animal life from oil or gas operations.

The purpose of the oil conservation act is conservation of oil and gas. Section 1 of the act declares that the failure of the state to adopt a conservation policy with respect to timbering allowed "the unwarranted slaughter and removal of magnificent timber abounding in the state, which resulted in an immeasurable loss and waste. In an effort to replace some of this loss, millions of dollars have been spent in reforestation, which could have been saved had the original timber been removed under proper conditions." Section 1 goes on to proclaim:

"The interests of the people demand that *exploitation and waste of oil and gas* be prevented so that the history of the loss of timber may not be repeated.

"It is accordingly the declared policy of the state to protect the interests of its citizens and land owners from *unwarranted waste of oil and gas* and foster the development of the industry along the most favorable conditions and *with a view to the ultimate recovery of the maximum production of these natural products.* To that end this act is to be construed liberally in order that effect may be given to sound policies of conservation and the prevention of waste and exploitation." (Emphasis supplied.)

The act is not designed to assure the balanced conservation of all natural resources but to assure conservation "with a view to the ultimate recovery of the maximum production" of oil and gas. The primary purpose of the act is *to prevent waste of oil and gas* so as to assure maximum production.

## A

The potential damage found by the NRC does not constitute waste within the "ordinary mean-

ing" of that term. As the circuit court correctly noted, "[t]he Michigan Supreme Court in *In re Seager Estate* put it succinctly. Judge McGRATH said 'It is not use, but abuse, that is waste', 92 Mich 186, 196; 52 NW 299 (1892)". Waste is "a species of tort, which may be briefly and very generally defined as the destruction, misuse, alteration, or neglect of premises by one lawfully in possession thereof, to the prejudice of the estate or interest therein of another".[16]

The state as owner has granted the right to drill for oil to Michigan Oil. The incidental and unpreventable effects of prudent and careful drilling do not represent abuse or waste of the remainder of the state's proprietary interest.[17] The state cannot complain of damage to its proprietary interest resulting from authorized and anticipated conduct.[18] "Ordinarily, acts which would otherwise constitute waste may be authorized by the person whose estate or interest is affected thereby, so as to absolve the tenant from liability therefor."[19] "It

---

[16] 78 Am Jur 2d, Waste, § 1, p 395. See, also, 93 CJS, Waste, § 1, p 559.

See *Jowdy v Guerin,* 10 Ariz App 205, 208; 457 P2d 745, 748 (1969); *Camden Trust Co v Handle,* 132 NJ Eq 97; 26 A2d 865 (1942); *Chapman Drug Co v Chapman,* 207 Tenn 502; 341 SW2d 392 (1960); *Weaver v Royal Palms Associates, Inc,* 426 SW2d 275 (Tex Civ App, 1968); *Sparks v Lead Belt Beer Co,* 337 SW2d 44 (Mo, 1960); *Bresnahan v Hicks,* 260 Mich 32; 244 NW 218 (1932); *Gade v National Creamery Co,* 324 Mass 515; 87 NE2d 180 (1949); *In re Stout's Estate,* 151 Or 411; 50 P2d 768 (1935).

[17] See 1 Summers, Oil & Gas Law, §§ 32, 34.

[18] The state as sovereign can ban or regulate many types of wasteful or harmful conduct under its police powers. These powers do not, however, expand the state's rights as proprietor when it claims that waste, as the term is ordinarily used, has been or is about to be committed.

[19] 78 Am Jur 2d, Waste, § 8, p 400.

See *Gulf Oil Corp v Horton,* 143 SW2d 132 (Tex Civ App, 1940); *Barrera v Barrera,* 294 SW2d 865 (Tex Civ App, 1956); *Turman v Safeway Stores,* 132 Mont 273; 317 P2d 302 (1957).

is of the nature of waste that it shall have been committed without legal right."[20]

A lessee is authorized to use the leasehold in a manner reasonably necessary to accomplish the purpose of the lease though damage may result. "[A]n oil and gas lease is said to carry within its implications, if not within its expression, such rights as to the surface as may be necessarily incident to performance of the objects of the contract, because a grant or reservation of minerals would be wholly worthless if the grantee or reserver could not enter upon the land in order to explore for and extract the minerals granted or reserved."[21] "Thus, it is often stated that an oil and gas lessee is entitled to use the surface of the premises embraced by his oil and gas lease *without liability for surface damage* caused by his operations on the leasehold, so long as such use and the manner of its exercise are reasonably necessary to effectuate the purposes for which the lease was made."[22] (Emphasis in original.)

The lease to Michigan Oil was for "the sole and only purpose of drilling, boring, mining and operating for oil and gas * * *".

Although use of the surface of the land by the lessee results in death and injury to wildlife belonging to the lessor, such use is not waste within the "ordinary meaning" of that term if it is reasonably necessary for oil and gas operations.[23] A

---

[20] 93 CJS, Waste, § 2, p 561. See, also, fn 19 *supra.*

[21] Anno: *What Constitutes Reasonably Necessary Use of the Surface of the Leasehold by a Mineral Owner, Lessee, or Driller Under an Oil and Gas Lease or Drilling Contract,* 53 ALR3d 16, 25-26, § 2.

See *Atlantic Refining Co v Bright & Schiff,* 321 SW2d 167 (Tex Civ App, 1959); *Miller v Ridgley,* 2 Ill 2d 223; 117 NE2d 759 (1954); *Davon Drilling Co v Ginder,* 467 P2d 470 (Okla, 1970); *Slade v Rudman Resources, Inc,* 237 Ga 848; 230 SE2d 284 (1976).

[22] Anno, fn 21 *supra,* § 2, p 31. See, also, cases cited *id.,* § 3, p 65.

[23] See, *e.g., Marland Oil Co v Hubbard,* 168 Okla 518; 34 P2d 278

lessee does not abuse or misuse the estate granted
when it carefully and prudently exercises the
rights specifically granted to it.

## B

Surface waste, "as those words are generally
understood in the oil business", refers to waste of
oil and gas that occurs once or as it is brought to
the surface, and thus does not include "damage to
or destruction of the surface, soils, animal, fish or
aquatic life".

The potential damage found by the commission
does not constitute "surface waste" as those words
are "generally understood" in the oil business.[24]

(1934); *Texas Pacific Coal & Oil Co v Truesdell,* 187 SW2d 418 (Tex
Civ App, 1945); *Warren Petroleum Corp v Martin,* 153 Tex 465; 271
SW2d 410 (1954); *Jones v Nafco Oil & Gas, Inc,* 371 SW2d 584 (Tex
Civ App, 1963), *aff'd,* 380 SW2d 570, (Tex, 1964); *Young v McGill,* 473
SW2d 672 (Tex Civ App, 1971).

[24] "Among the earlier legislative enactments designed to prevent
the waste of oil and gas are the statutes in many of the states
requiring operators to cap or shut in an oil or gas well within a stated
or a reasonable time after drilling into the oil or gas producing
stratum. Under this earlier type of statute the operator is usually
permitted to leave a well open for a time within which to determine
whether it is an oil producer, to allow the escape of gas while
cleaning a gas well, while drilling to a deeper sand, or where the well
is used for the production of oil. The more recent type of conservation
statute prohibits *waste of natural gas and oil and usually defines
waste as including their escape into the open air in commercial
quantities,* and either by express statutes or by the regulations of the
conservation agencies, wells are required to be shut in when an oil or
gas stratum is penetrated, until the oil or gas can be produced
without waste, and upper strata are required to be cased or sealed
before deeper drilling is continued, and limitations are placed upon
the escape of gas from an oil well.

"In some states the statutes give the conservation agency authority
to make rules and regulations for the prevention of 'blow-outs',
'caving' and 'seepage' as these terms are understood in the oil and gas
business. A few states have statutes making it unlawful for an
operator to negligently permit a well to go wild or get out of control.

"Several states have statutes prohibiting the waste of oil through
inefficient storage and the waste of oil and gas through leakage in
transportation or storage facilities.

"*A very common cause of surface waste is the accidental or negli-*

## C

Nor does the potential damage found by the NRC constitute "surface waste" because of *"unnecessary* damage to or destruction of the surface, soils, animal, fish or aquatic life or property from or by oil and gas operations".[25]

An Attorney General Opinion, OAG, 1971-1972, No. 4718, p 17 (April 6, 1971), defined the provision:

"To the extent that oil and gas operations can be conducted from a given location without causing *unnecessary* damage to or destruction of the surface, soils, animal, fish or aquatic life or property, oil and gas operations cannot be proscribed therefrom, nor can the applicant be denied á permit to drill therefrom. * * *

"The damage or destruction resulting, caused or threatened by the operation at a given location must be 'unnecessary.' *The statute does not contemplate that no damage or destruction will result from operations. It prohibits damage arising from careless, imprudent operations—damages that may be prevented by appropriate measures."* (Emphasis supplied.)

The hearing examiner similarly said:

"What is 'unnecessary' damage? Any activity, any user, of whatever kind of nature, requires some change

---

gent burning of oil or gas escaping from wells, pipelines, or storage facilities. In several states there are statutes prohibiting the wasteful burning of gas wells. There are also various provisions of the statutes and regulations designed to remove fire hazards and prevent fires which may result in wasteful burning of oil or gas." 1 Summers, *supra*, § 77, pp 248-251 (emphasis supplied).

"The state has the power and duty to prevent the waste of oil and gas not only in place but above the ground, and both kinds of waste are usually denounced by the statutes. In determining the existence of waste above the ground, excess storage of oil and gas and market demand are important factors." 58 CJS, Mines and Minerals, § 229, p 622.

[25] MCL 319.2(1)(2)(2); MSA 13.139(2)(1)(2)(2) (emphasis supplied).

in existing circumstances. Clearly, if a well is to be drilled and operated there must be some modification of the existing circumstances. The statute does not prohibit 'damage' but only 'unnecessary' damage. The drilling and operation of an oil well is a recognized, lawful activity. Implicit in this recognition is the fact that this activity will cause change. The well requires clearing of location, drilling machinery, installations and personnel. This is contemplated and understood for the statute permits 'necessary' damage, but bars only that damage which is 'unnecessary'. Drilling and producing operations carried on in a careful and prudent manner and in keeping with applicable rules and regulations cannot be 'unnecessary' damage since these activities are required to accomplish legitimate drilling and producing objectives."

The circuit judge said, however:

"It appears to this court that even inevitable damage done in the most careful and prudent manner may yet be 'unnecessary' in certain circumstances. Whether or not damage is necessary is not simply a question of whether or not the oil can be extracted without damage, carelessly or negligently caused, *it also concerns whether the oil itself is necessary, or whether the oil is so necessary that other values must be subrogated.*" (Emphasis added.)

The Court of Appeals agreed and said:

"We conclude that the construction given to the term waste by the Natural Resources Commission and the circuit court is the correct one and that the very acts of drilling for oil may constitute or result in waste prohibited by the oil conservation act."[26]

This Court's opinion in *State Highway Commissioner v Vanderkloot,* 392 Mich 159, 175; 220

[26] *Michigan Oil Co v Natural Resources Commission,* 71 Mich App 667, 686; 249 NW2d 135 (1976).

NW2d 416 (1974), considered the construction of the term "necessity" in another statute. There the argument was that the required determination of "necessity" for the taking of land by the highway commission did not provide an adequate standard for judicial review of administrative action. The Court concluded that the term "necessity" suggested sufficiently precise standards of review because necessity is to be determined with respect to the purposes stated in the petition for taking:

> "The inquiry more specifically reviews 'the necessity of the taking of all or any part of the property for the *purposes stated in the petition'.* MCL 213.368; MSA 8.261(8). (Emphasis added.) Obviously the 'purpose stated in the petition' cannot be the taking of the particular property, because the Highway Department's purpose is not to take property but '[i]n general, it is the business of the commission to build and maintain highways.' *Central Advertising Co v State Highway Commission,* 383 Mich 1, 4; 172 NW2d 432 (1969). '[T]he purposes stated in the petition' therefore must be the highway purposes stated therein."

It would have been circular in *Vanderkloot* to construe "purposes stated in the petition" as the mere taking of property, because this would have produced the result that the mere intent to take always supplied the purpose for and justified the taking. Similarly, § 2(1) of the oil conservation act is stripped of its meaning if the term "unnecessary" is to be defined solely by reference to mere damage to or destruction of the surface, soils, animal, fish or aquatic life or property from or by oil and gas operations. The mere fact of damage, no matter how extensive, cannot in and of itself suggest whether such damage is unnecessary or how lack of necessity is to be judged.

Substituting the term "serious damage" for

"damage" does not resolve the question. It is again pertinent that neither opinion for affirmance addresses the question of a standard for determining whether damage is "unnecessary" nor, in concluding that the proofs adduced showed unnecessary damage, do they review the evidence and relate it to a standard.

The word "unnecessary" must be construed in conjunction with the stated purpose of the act to prevent "unwarranted waste of oil and gas" and to "foster the development of the industry along the most favorable conditions and with a view to the ultimate recovery of the maximum production of *these* natural products". (Emphasis supplied.) Whether damage is "unnecessary" is to be determined with respect to the legislatively mandated goal of maximum recovery of oil and gas through prevention of unnecessary waste of oil and gas.

The act indicates an intention to differentiate between unnecessary damage and mere damage, however severe the latter may be. Nowhere is this better illustrated than in § 6(c), by which the Supervisor of Wells is specifically empowered to "prevent pollution, damage to or destruction of fresh water supplies including inland lakes and streams and the Great Lakes and connecting waters, and valuable brines by oil, gas or other waters, to prevent the escape of oil, gas or water into workable coal or other mineral deposits." This language demonstrates an intention to allow the Supervisor of Wells to impose an absolute standard with respect to fresh water supplies in an effort to prevent any and all damage. In contrast, the following clauses empower the Supervisor of Wells to "require the disposal of salt water and brines and oily wastes produced incidental to oil and gas operations, in such manner and by such

methods and means that no *unnecessary damage*
or danger to or destruction of surface or under-
ground resources, to neighboring properties or
rights, or to life, shall result". (Emphasis supplied.)
By differentiating between the power of the Super-
visor of Wells to determine and prevent damage
with respect to fresh water supplies by applying
an absolute standard and his more limited power
to require no unnecessary damage to surface or
underground resources resulting from the disposal
of salt water, brines and oily waste, the Legisla-
ture indicated that mere damage is not to be
treated the same as, or equated with, unnecessary
damage.

We agree with the dissent in the Court of Ap-
peals that "the question of whether oil and gas
production is 'necessary' was affirmatively an-
swered by the act itself, as, indeed, it was an-
swered by the various acts of the Legislature
authorizing the commission to select state lands
for oil and gas leasing". We would hold that in
deciding whether there will be unnecessary dam-
age to or destruction of the surface, soils, animal,
fish or aquatic life or property from or by oil and
gas operations, it is not material whether the oil is
itself necessary or not. Whether damage is unnec-
essary is to be determined in the context of the
expressed purpose of the act to maximize the
recovery of oil through prevention of its unwar-
ranted waste.

The examiner found that Michigan Oil will con-
duct its drilling in a careful and prudent manner
and that no damage will be inflicted upon the
environment except for that necessarily caused by
oil drilling. That finding has not been disputed by
the NRC, the intervenor, the circuit court, or the
Court of Appeals.

We conclude that the NRC erred in its construction of § 2(1) of the oil conservation act and, on the facts of this case, had no authority to deny a permit.

V

The intervenor contends that even if the oil conservation act and the Department of Conservation act do not provide adequate statutory bases for denial of Michigan Oil's application for a permit, when those acts are read *in pari materia* with the environmental protection act the proposed drilling would constitute waste within the meaning of the *oil conservation act.*

The argument is premised on Const 1963, art 4, § 52,[27] requiring the Legislature to "provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction". It is then argued that in light of the Legislature's failure to incorporate environmentally protective provisions in all previously and thereafter enacted legislation, the environmental protection act must be deemed incorporated into all such legislation.[28]

The environmental protection act, by its terms, is substantively supplementary to existing laws and administrative and regulatory procedures pro-

[27] The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment or destruction." Const, 1963, art 4, § 52.

[28] Although the intervenor suggests that *State Highway Commissioner v Vanderkloot,* 392 Mich 159; 220 NW2d 416 (1974), held that to be the law of Michigan, these issues were not decided in that case. Three of the six members of the Court sitting in the case specifically declined to decide that issue.

vided by law.[29] It provides an independent procedural route available in all cases.[30] The substantive and procedural deficiencies or limitations of other legislation notwithstanding, the environmental protection act is, in itself and without any need for reading it *in pari materia* with other statutes, adequately protective of the environment.

The act requires, however, that if a violation of its provisions is alleged the defendant be explicitly notified that its actions are being challenged under and pursuant to the provisions of that act. This accords with ordinary notions of orderly procedures.

The Court is not empowered to direct the Attorney General or the NRC to raise issues under the environmental protection act. The act contemplates that a governmental agency may fail to raise environmental issues and therefore authorizes other persons to intervene in administrative proceedings or to commence an independent action; those provisions protect against official indifference.

## VI

The environmental issues were triable under the environmental protection act. The intervenor, albeit inartfully, sought to raise those issues in its petition to intervene. It did not, however, state environmental protection act issues in its pretrial statement, either because intervention had been allowed on condition that no new issue would be raised[31] or because it thought such issues could be

[29] MCL 691.1206; MSA 14.528(206).

[30] MCL 691.1202; MSA 14.528(202).

[31] The narrowing of the triable issues appears inconsistent with the interests protected by the environmental protection act. Commencement of an environmental action in circuit court or intervention in

raised under the oil conservation act's rubric "un-necessary damage" or for other reasons.

A more appropriate disposition of this case would be to reverse the Court of Appeals and remand to the NRC for consideration of the environmental protection act claims under that act after all interested parties have had adequate time to compile and present evidence on such issues.

## VII

In both *West Michigan Environmental Action Council v Natural Resources Commission,* 405 Mich 741; 275 NW2d 538 (1979), and the instant case, the oil companies (and in *West Michigan,* the DNR as well) took the position that the environmental issue was not properly raised and triable—in *West Michigan* because the complaint related only to the effects of the consent order and not to the effects of drilling test wells, in *Michigan Oil* because the issue framed was whether, as a result of the drilling, there would be "unnecessary damage" within the meaning of the oil conservation act.

In both cases, the trier of fact agreed with the

administrative proceedings after a project is well under way and, as here, legal proceedings are about to reach the hearing state is, understandably, a source of dismay to those who have been laboring to bring a project to fruition but, nevertheless, often occurs in environmental litigation.

Whether the delay of the intervenor in the instant case justified rejection altogether of the environmental claims has not been briefed. It appears that the asserted delay in commencing the action was "several months".

Allowance of intervention under the environmental protection act would have changed altogether the character of the proceedings. A new triable issue would have been injected, probably requiring an extended delay so that counsel for Michigan Oil could seek to determine with some precision the specific environmental claims being asserted and attempt to compile evidence rebutting them. The process would have been most time-consuming, not weeks but months. It is, therefore, doubtful whether the asserted delay in seeking to intervene prejudiced Michigan Oil or the other litigants.

oil companies on the triable issue and concluded that any impact of the drilling on the ecology was not a valid reason for refusing to permit the drilling to proceed.

While the environmental plaintiffs and intervenors presented evidence of environmental damage to the PRCSF as an entirety, the oil companies did not offer rebuttal either because they could produce none or because they relied on their legal position that the environmental harm shown by the environmental plaintiffs and intervenors was not a valid reason for refusing to allow the drilling.

In both cases, on review—after the evidentiary record was closed—the trier of fact was reversed on the question of what was the triable issue: This Court holds, in *West Michigan,* that the effects of the test drilling was a triable issue in that case. The NRC ruled in the instant case that "unnecessary damage" under the oil conservation act includes damage to the ecology; the circuit court and the Court of Appeals affirmed, and this Court affirms. As a consequence, the oil companies have not had an opportunity—after the rulings against them on what constituted the triable issue—to offer rebuttal evidence.

The evidence of environmental damage is in both cases incomplete and imprecise, raising as many questions as it answers; it consists largely of opinion testimony, written reports and similar secondary evidence not confined to the effects of the specific drilling in issue. The hearing officer in the instant case posed a number of questions regarding the substantiality of the environmental claims which have not been met with evidence. His findings that no damage would result from drilling the one well Michigan Oil seeks to drill

are well supported and not adequately met by the
generalized findings of the NRC concerning the
effect of "leapfrogging" hydrocarbon drilling on
the PRCSF at large.[32]

---

[32] The hearing examiner found:
*Well Site and Surrounding Area:*

\* \* \*

County roads border Section 22 on three sides and a trail road is on
the fourth. Tin Shanty Bridge Road, running north and south along
the east section line [approximately 1300 feet east of the drilling site],
is a primary county road. Maintained throughout the year this road
connects to the south with Gibbs Valley Road, a black-top road
running from Gaylord. At the northeast corner of the section, Tin
Shanty Bridge Road meets Sturgeon Valley Road out of Vanderbilt.
Sturgeon Valley Road, running along the north line of Section 22, is
also a primary county road. On the south line is Old Round Lake
Road running [approximately 300 feet south of the site] west from Tin
Shanty Bridge Road to the Round Lake Campground. The roads on
the north and south lines are maintained throughout the year except
that they are not plowed during winter time. There are also several
trail roads within Section 22, but these are not county roads and are
not maintained.

The drill site is on high, sandy land sloping gently towards the
Black River just over a mile to the south. Within two or three miles
of the well site are the Pigeon River Research Station (Old Headquar-
ters), Round Lake Campground, and the Pigeon River Bridge and
Pigeon River Forest Campgrounds. The State-Charlton 1-4 discovery
well is 2-1/2 miles to the south in Charlton Township. Also, near at
hand, about one half mile south and just off Tin Shanty Bridge Road,
is a snowmobile parking lot. Tyrolean Hills ski area is on the west
side of Charlton, and Lakehead Pipeline running from western Can-
ada to Port Huron traverses the west side of both Charlton and
Corwith Townships, crossing the Black River. Michigan Consolidated
Gas Company's pipeline running south from the Charlton 1-4 also
crosses the Black River in the south part of Charlton Township.

The well site is stocked with aspen, birch and maple timber. The
virgin pine was long ago removed, and Section 22 was entirely
planted in the 1930's. This section has witnessed numerous, commer-
cial timber harvests. Timber was harvested in 1946 on the 40 acres on
which the well site is located and again in 1963. Altogether, from
1944 to 1968, there have been 16 timber harvests in Section 22.
Immediately to the south in Section 27 there was clear-cut timber
removal in 1967. In Section 23 to the east, timber harvest operations
were carried on in 1970. Currently, there is a timber harvest under
way in Section 21. Timber harvesting requires chain saw operations,
loading vehicles, trucks and men.

The value of the timber at the well site, on the stump, is $3.00 per
cord. The timber will run 10 cords per acre.

The timber cover at the well site is common to northern Michigan.

Some fifty-one (51%) percent of all forest lands in northern Michigan have this type of cover.

In the Pigeon River Area are found deer, bear, bobcat, elk and game birds. The Michigan elk range, which includes Corwith Township, covers approximately 600 square miles of territory, and is bounded on I-75 on the west, M-68 on the north, M-33 on the east, and M-32 on the south. The elk population is between 500 and 1,000 animals. Bear number from 30 to 50. The Pigeon River Area furnishes good habitat for wildlife. However, no unique or special wildlife habitat features are present at the well site, and the habitat is that generally found throughout the Pigeon River country.

The area is the scene of a great deal of activity. Among the activities carried on are:

1. Camping;
2. Snowmobiling;
3. Sight seeing;
4. Deer hunting;
5. Bear hunting;
6. Bobcat hunting;
7. Coyote hunting;
8. Rabbit hunting;
9. Bird hunting;
10. Commercial timber harvests;
11. Training of hunting dogs;
12. Fishing;
13. Mushroom picking;
14. Motorcycle riding;
15. All-terrain vehicle cruising;
16. Hiking;
17. Horseback riding;
18. Pigeon River Research Station;
19. Skiing;
20. Private clubs;
21. Pipelines;
22. Cabins;
23. Oil and gas wells;
24. DNR meetings and classes;

Snowmobilers use Old Round Lake Road, Tin Shanty Bridge Road, and Sturgeon Valley Road, all bordering Section 22, as well as the trail road on the west side of that section. Other roads throughout Corwith and Charlton Townships are used for snowmobile activity. There is a snowmobile parking lot in Section 27 off Tin Shanty Bridge Road and another parking lot in Section 21 near Sturgeon Valley Road. At one time this past winter, twenty snowmobiles with forty persons were observed at the Round Lake Campground.

There are presently five producing oil and gas wells in Charlton Township.

* * *

*Effect of Proposed Well:*

If the State Corwith 1-22 is drilled, there will be no significant effect as to the soil, surface, fish or aquatic life or property.

This well will not affect in any significant way, deer, birds and small animals.

The claim is made, however, that the well would cause serious and unnecessary damage to elk, bear and bobcat. Nels I. Johnson, Regional Wildlife Biologist for Region II, testified as follows:

* * * If there were no elk up there, and if there were no bear or bobcats—just these other animals—from a wildlife point of view we could not claim serious and unnecessary damage.

With regard to elk, bear and bobcat, there is testimony from several DNR witnesses that *any* human activity disturbs these animals, is detrimental to them, whether it be snowmobiling, camping, an oil well, or any other human presence or user. It is not an oil well in particular but human activity of any kind which disturbs them. It is the position of these witnesses that an oil well as a human activity will disturb the elk, bear and bobcat, and that any disturbance is serious and unnecessary damage because of their sensitive nature.

Although more than two years have now passed since the State-Charlton 1-4 discovery well, neither the DNR nor any DNR witness has yet made a study to determine the effect of an oil well on elk, bear and bobcat. Nor, for that matter, has one even been suggested. Likewise, no witness was able to point to a study on this subject made by anyone. The record is devoid of evidence as to the extent of disturbance by an oil well based on study or factual data.

At the same time, the testimony shows that elk are still in that area more than two years after the completion of the discovery well, sharing their range not only with oil and gas operations, but also with camping, snowmobiling, hunting, timber harvesting, and many other public and private uses.

* * *

Some DNR witnesses expressed fear as to offset wells which might follow. The testimony, however, was that Michigan Oil Company planned to drill only one well, and that one well could drain the prospective reservoir. Moreover, the control over the granting of additional permits, and the spacing and density of well locations, is vested by law in the DNR (§§ 6, 13 and 23 of Act 61 of Public Acts of 1939, above cited; Michigan Administrative Code, R 299.1101). Additionally, each well is to be judged on its own merits under Commission policy and DNR procedures.

The well must be drilled in a careful and prudent manner by Michigan Oil Company. The location and access will be governed and controlled by the Forestry Division of the DNR. Drilling and producing will be at all times under the supervision and control of the DNR through its Geological Survey Division.

It must be concluded that this well, drilled and operated in a careful and prudent manner, will not cause any serious or unnecessary damage or destruction to the surface, soils, fish or aquatic life or property, nor will it unreasonably spoil or molest state land.

In both cases, leasehold rights granted by the state and large expenditures of time and money over an extended period of time by the oil companies in reliance on those rights are dismantled without an adequate opportunity, after the triable issue has been definitively stated, to test the real worth of the environmental claims.

---

It has not been established that the State-Corwith 1-22 will cause damage to elk, bear or bobcat.

If human presence disturbs elk, such disturbance is already widespread in that area, and no one could testify that an oil well is more disturbing than snowmobiling, hunting, use of dog packs, commercial timber harvesting, and the many other activities now carried on throughout the year.

The NRC found:

It appears from the findings presented by the parties and from those submitted by the hearing officer that numerous issues and legal questions were raised during the 20 days of hearing, but none of the facts need to be reviewed in this opinion by the Commission or specific findings of fact and conclusions of law be made thereon except as may be set out in these findings.

The testimony shows that in the Pigeon River area are found deer, bear, bobcat, elk and game birds. The Michigan elk range, which includes Corwith Township, covers approximately 600 square miles of territory, and is bounded by I-75 on the west, M-68 on the north, M-33 on the east, and M-32 on the south. The elk population is between 500 and 1,000 animals. Bear numbers from 30 to 50. The Pigeon River area furnishes good habitat for wildlife.

Damage to the ecosystem and serious or unnecessary damage to animals would be caused by opening entrance roads, truck traffic, succession of wells and general activities encountered in all oil-gas production. Particularly, serious effects would be caused to elk, bear and bobcat and could cause their virtual removal from a portion of the Pigeon River area. The tendency of the animals would be to avoid the area. Such effect would be particularly noticeable in the case of elk who are a wide ranging animal.

The Pigeon River area is the last stronghold of the bear and bobcat. Places where bear and bobcat can live are limited. Section 22 is good bear habitat.

Elk would be particularly affected by an oil operation because of their fragile nervous system and even clearing one acre will affect them. In turn, many small animals would be affected.

The above testimony from game biologists as to the effect of the drilling of a well in this area comes from the DNR presentation and the opinions of their experts are unrebutted on the record. On considering the foregoing testimony the Commission must find that damage to or destruction of the surface, soils, animals, fish or aquatic life will occur.

The decision here brings to mind Mr. Justice
Holmes' observations in the *Northern Securities*
case:

"Great cases like hard cases make bad law. For great
cases are called great, not by reason of their real
importance in shaping the law of the future, but be-
cause of some accident of immediate overwhelming
interest which appeals to the feelings and distorts the
judgment. These immediate interests exercise a kind of
hydraulic pressure which makes what previously was
clear seem doubtful, and before which even well settled
principles of law will bend. What we have to do in this
case is to find the meaning of some not very difficult
words. We must try, I have tried, to do it with the same
freedom of natural and spontaneous interpretation that
one would be sure of if the same question arose upon an
indictment for a similar act which excited no public
attention, and was of importance only to a prisoner
before the court. Furthermore, while at times judges
need for their work the training of economists or states-
men, and must act in view of their foresight of conse-
quences, yet when their task is to interpret and apply
the words of a statute, their function is merely aca-
demic to begin with—to read English intelligently—and
a consideration of consequences comes into play, if at
all, only when the meaning of the words used is open to
reasonable doubt."[33]

This case, in which no opinion was signed by more
than three justices,[34] makes neither good nor bad
law; it is simply a result.

We would extend Michigan Oil's lease for the
time that elapsed between the denial of its applica-
tion and the expiration of its lease,[35] and remand

---

[33] *Northern Securities Co v United States,* 193 US 197, 400-401; 24
S Ct 436; 48 L Ed 679 (1904).

[34] *Negri v Slotkin,* 397 Mich 105, 109; 244 NW2d 98 (1976).

[35] See *State ex rel Porterie v Grace,* 184 La 443; 166 So 133 (1936).
The Court held that where drilling operations under mineral leases
were interfered with by unsuccessful suit against the lessee, the lessee

to the NRC for a hearing under the environmental protection act.

COLEMAN, C.J., concurred with LEVIN, J.

RYAN, J. *(to reverse).* I agree with Justice LEV-IN's conclusion that neither 1921 PA 17, as amended,[1] nor 1939 PA 61, as amended,[2] constitute sufficient statutory authority for denial of the drilling permit in the instant case. Further, because of the unique situation 'facing the Court in deciding this case, I agree with Justice LEVIN that Michigan Oil's lease should be extended but I would remand this case to the circuit court for a hearing under the Michigan Environmental Protection Act, MCL 691.1201 *et seq.;* MSA 14.528(201) *et seq.*

In *West Michigan Environmental Action Council v Natural Resources Commission,* 405 Mich 741; 275 NW2d 538 (1979), this Court permanently enjoined the drilling of ten exploratory wells in the same area of the same Pigeon River Country State Forest in which the instant plaintiff is seeking permission to drill. The basis for decision in *West Michigan* was the holding that the evidence adduced at trial in that case demonstrated that the drilling of wells in this area of the forest would likely result in an impairment or destruction of the Pigeon River Country State Forest elk in violation of the MEPA. Because of this decision in *West Michigan,* I feel the provisions of the MEPA cannot be ignored in deciding the instant case. I recognize that the MEPA was never litigated in

___

was entitled to an extension of the time allowed in its contract for the beginning of drilling operations for a period equal to the time during which litigation was pending.

[1] MCL 299.1 *et seq.;* MSA 13.1 *et seq.*

[2] MCL 319.1 *et seq.;* MSA 13.139(1) *et seq.*

this case, at least in part because the intervenor was precluded from raising any concerns under that act. It is beyond my powers of conjecture to determine the reason why the Department of Natural Resources, which is statutorily charged with the responsibility to protect and conserve the natural resources of this state, failed to raise the MEPA in the proceedings concerning the denial of this permit before both the special hearings officer and the Natural Resources Commission.

Nonetheless, the failure of the department to adequately discharge its statutory responsibility to the people of our state should not have precluded consideration of the MEPA in the instant proceedings. I agree with Justice Levin in extending plaintiff's lease but would remand this case to the circuit court for proceedings under the MEPA. See particularly, MCL 691.1202; MSA 14.528(202).